REVISED January 4, 2010

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 11, 2009

Charles R. Fulbruge III
Clerk

No. 07-60748

UNITED STATES of AMERICA

Plaintiff-Appellee

v.

JOHN H. WHITFIELD; PAUL S. MINOR; WALTER W. TEEL

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Mississippi

Before GARWOOD, BENAVIDES, and HAYNES, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants, attorney Paul Minor and former Mississippi state judges John Whitfield and Walter ("Wes") Teel, were charged with participating in two separate bribery schemes in which Minor arranged, guaranteed, and eventually paid off loans for Whitfield and Teel, allegedly in order to corruptly influence the outcome of cases Minor filed in their courts. A jury found all three appellants guilty of conspiracy in violation of 18 U.S.C. § 371; mail, wire, and honest services fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 2; and federal program bribery in violation of 18 U.S.C. § 666. Additionally, Minor was convicted of racketeering in violation of the Racketeer Influenced and Corrupt

Organizations Act (RICO), 18 U.S.C. § 1962. Appellants appeal their convictions and sentences on numerous grounds. For the following reasons, we VACATE all the convictions related to federal program bribery under 18 U.S.C. § 666, including the conviction of Minor and Teel for conspiracy to violate section 666. We AFFIRM all other convictions, and we REMAND for resentencing as to all appellants in accordance with this opinion.

## FACTS

This case concerns two separate bribery schemes, at the center of which lay Paul Minor, formerly a successful trial attorney in Mississippi. Minor had a professional, if not personal, relationship with appellants John Whitfield and Wes Teel prior to the events giving rise to this prosecution. Acting as guarantor, Minor arranged for Peoples Bank in Biloxi, Mississippi to loan Whitfield and Teel substantial amounts of money, purportedly in connection with each of their campaigns for state judicial office. Although the structure of the loan transactions was similar, neither Whitfield nor Teel had any knowledge of Minor's dealings with the other. As the two bribery schemes were thus distinct, we relate the facts surrounding each separately.

## I. Whitfield Scheme

In the fall of 1998, Whitfield was in the midst of a reelection campaign to retain his position as circuit judge on the Second Circuit Court of Mississippi. Minor arranged for The Peoples Bank in Biloxi, Mississippi, with which he had substantial deposits, to grant Whitfield two loans with Minor serving as guarantor. Peoples Bank sought no collateral to secure the loans, but rather, in the words of the loan officer that handled the transactions, relied "simply on the strength of Mr. Minor's financial ability" to ensure repayment. On October 12, 1998, Peoples Bank loaned Whitfield $40,000 for "campaign funds," which he deposited into his campaign account. Later, after Whitfield's successful

2

reelection, Peoples Bank granted Whitfield another loan for $100,000 on November 19, 1998, the purpose of which was described in the loan documents as a "down payment on home." Whitfield deposited the proceeds of this loan in the bank account of his then-girlfriend, who used the majority of the money to place a down-payment on a house for the two of them. Whitfield and his girlfriend spent the remainder of the loan proceeds to purchase home furnishings and to pay credit card bills.[1] Whitfield never listed either loan on his campaign disclosure forms, nor did he report subsequent loan repayments made by Minor on the annual statements of economic interest that he was required to file as a judge.[2]

At trial, the Government contended that, as Whitfield had little or no money at the time, he accepted the loans never intending to pay them back himself. Indeed, by the time that the loans were eventually repaid at the insistence of bank examiners in 2002, Whitfield had only contributed a total of approximately $13,200 towards repayment of his loans and the interest thereon, $5,000 of which came from the campaign account originally funded by the $40,000 loan and approximately $5,650 of which was only made possible by a timely and unexplained cash deposit made to his personal checking account after his check to Peoples Bank had bounced. In contrast, over the nearly four-year period in which the loans were outstanding, Minor, either directly or indirectly, paid a total of approximately $178,600 in principal and interest on the loans.

---

[1]In January of 1999, Whitfield perjured himself while testifying in a divorce proceeding involving his then-wife, claiming that he was the sole guarantor on the $40,000 loan and that he did not contribute any money towards the purchase of the home shared by him and his girlfriend.

[2]Under Mississippi law, Whitfield and Teel were required to file an annual statement of economic interest disclosing any private sources of income in excess of $2,500, including cash and loan forgiveness.

At Minor's request, the loans were structured as renewable short-term "balloon" loans, whereby every six months the accumulated interest became due and the loan principal would either have to be renewed or paid in full. Under the Government's theory of the case, this arrangement allowed Minor to keep Whitfield on a string while Minor held the bank at bay. Every six months when the loans became due, bank officials would attempt to notify Whitfield by mail and telephone, yet Whitfield was unresponsive and largely ignored his obligation. As a result, the bank would be forced to contact Minor, who, instead of paying directly by check, would cash a check and renew the loans by making the necessary payments in cash.[3] Whitfield would occasionally make small payments with his own money, but, as noted above, the vast majority of the payments were made by Minor.

Meanwhile, shortly after Minor arranged the loans for Whitfield in the fall of 1998, Minor's law firm filed a potentially lucrative personal injury suit, Marks v. Diamond Offshore Management Co.,[4] in the Second Circuit Court. Marks was injured while working on an off-shore oil rig, and he hired Minor & Associates on a contingent-fee basis to represent him in the ensuing Jones Act suit against his employer. Although plaintiffs seeking personal injury damages generally prefer to try their cases before a jury, Minor's firm made the unusual request for a bench trial. Normally, the Second Circuit Court followed a procedure whereby cases were randomly assigned among the four Second Circuit judges after the defendant had filed an answer. However, immediately upon filing their complaint, Minor's firm circumvented this process by filing a motion with Judge

---

[3]On the stub of one such check for $7,000, Minor's office manager noted its purpose as "loan interest for J.W."

[4]2000 WL 35444564 (Miss. Cir. Sep. 25, 2000).

4

Whitfield seeking an expedited hearing to set a trial date, purportedly so that Marks could obtain funds to cover his medical expenses as soon as possible. On February 10, 1999, twelve days before Diamond Offshore had even received a summons (and thus had yet to file an answer triggering the random assignment procedure), Whitfield issued a "Fiat" requiring the parties to appear before him in a hearing on the motion to set a trial date. At the hearing Whitfield set the case for trial in his own court, thereby effectively assigning the case to himself.

Diamond Offshore's attorneys became suspicious and investigated for a potential relationship between Whitfield and Minor & Associates. However, they discovered no connection (in part because Whitfield's campaign disclosure forms revealed none), nor did Whitfield inform the parties of his financial arrangement with Minor. The case was tried before Whitfield June 20–22, 2000. On July 12, 2000, Whitfield ruled in favor of Marks and awarded him $3.75 million in damages. Whitfield's loans matured again soon thereafter, and, unbeknownst to Diamond Offshore's counsel, on September 8, 2000, Minor made a $6,900 cash payment to renew them. On October 3, 2000, in response to Diamond Offshore's post-trial motions, Whitfield reduced the award and issued a final judgment in Marks' favor for $3.64 million, $3 million of which was attributable to noneconomic "soft" damages (pain, suffering, loss of enjoyment of life). Diamond Offshore later appealed to the Mississippi Supreme Court, which, sitting en banc, affirmed the finding of liability. Diamond Offshore Mgmt. Co. v. Marks, 2003 Miss. LEXIS 88, at *36 (Miss. Feb. 27, 2003), withdrawn, 2007 Miss. LEXIS 237 (Miss. Apr. 26, 2007). However, after conceding that "the trial court had ample material in the record to justify a high award of damages," the court reduced the compensatory damages to $1 million (leaving a total award of $1.64 million), which it deemed to be "within the range of what we consider acceptable for [Marks'] pain, suffering, and loss of enjoyment

5

of life." Id. at *36–37.[5]

Soon after the close of the Marks trial, Whitfield resigned from the bench, and Minor helped him obtain a job at a prominent law firm in Gulfport, Mississippi. At that point, Minor deviated from his standard method of payment on the loans by funneling money through Whitfield rather than paying the bank himself. In May and December of 2001, Minor wrote two checks to Whitfield for $15,000 and $10,000 respectively. The checks were accompanied by cover letters attempting to conceal their true purpose, which was revealed when Whitfield issued checks to Peoples Bank in the exact same amounts as soon as Minor's checks cleared.[6] Afterward, Minor returned to his practice of making cash payments directly to the bank.

Eventually, in July of 2002, federal and state bank examiners conducting a routine audit of Peoples Bank discovered and criticized the loans, which by that point had been consolidated into a single obligation. As a result, the bank requested that the debt be satisfied in full. Minor agreed, and instead of paying it off himself directly, he enlisted the help of Leonard Radlauer, an attorney from New Orleans, to act as a strawman. Radlauer, who was a friend of Minor's from law school, was also an acquaintance of Whitfield and had contributed to his campaign when Whitfield first ran for office. Minor asked Radlauer if he would

---

[5]On April 19, 2007, the Mississippi Supreme Court requested sua sponte that the parties submit a copy of the indictment and jury verdict from the district court proceedings in the instant case. Diamond Offshore Mgmt. Co. v. Marks, 2007 Miss. LEXIS 243, at *1 (Miss. Apr. 19, 2007). One week later, the court granted Diamond Offshore's motion for rehearing, withdrew its original opinion, vacated Whitfield's judgment, and remanded the case for a new trial on all issues. Diamond Offshore Mgmt. Co. v. Marks, 2007 Miss. LEXIS 237, at *1 (Miss. Apr. 26, 2007).

[6]The first check was purportedly an "advance" on an unresolved lawsuit involving Whitfield's mother that was being handled by Minor's firm, while the second check was purportedly payment for a "position paper" on a particular matter of law that Whitfield apparently never wrote.

pay off the Whitfield loan in order to "keep it out of the newspapers" and assured Radlauer that he was not "doing anything funny." Radlauer agreed, and on August 27, 2002, Minor wired $125,000 to Radlauer's account in New Orleans. That same day, Radlauer wired $118,652.42 to Peoples Bank to pay off Whitfield's loan. Minor insisted that Radlauer keep the difference, but Radlauer eventually returned the money to Minor.[7]

Some three weeks later, Minor traveled to New Orleans and approached Radlauer in a local bar appearing "panic stricken" and "very nervous." Minor informed Radlauer that the Federal Bureau of Investigation (FBI) might want to talk with him and assured him that Whitfield would pay him back. When Radlauer protested that there was nothing to repay, Minor suggested that he misrepresent the true nature of the transaction to the FBI so as to conceal Minor's role. In the meantime, a FedEx envelope from Whitfield's law firm containing a falsified Whitfield promissory note to Radlauer for $117,013.21 had arrived at Radlauer's office. The note was back-dated to August 26, 2002, the day before Radlauer had made the wire transfer to Peoples Bank. The envelope also contained a handwritten note from Whitfield thanking Radlauer for his "assistance" and "kindness" in paying off the loan and assuring Radlauer that he would "repay the entire amount plus interest." Realizing that he had been drawn into a "shady" transaction, Radlauer immediately returned the false promissory note to Whitfield, and, in a letter sent to both Whitfield and Minor, insisted that he be kept out of any improper arrangements in the future. Neither man responded. By the following summer, Whitfield and Minor were under indictment.

II. Teel Scheme

---

[7]It appears that Radlauer only returned the money after he later found himself under investigation by the FBI for his role in the transaction.

In October 1998, at the same time that Whitfield was seeking reelection, Wes Teel was running for judicial office for the first time and facing a run-off election for a seat on the Eighth Chancery Court District of Mississippi. Just as he had done for Whitfield, Minor offered to guarantee a loan from Peoples Bank, in this case a line of credit up to $25,000. Teel accepted, and the loan closed on November 12, 1998. Teel withdrew $24,500, which he deposited in his campaign account, and with the help of those funds he won the election. Teel did not report the loan on his campaign disclosure forms.[8]

Again, at Minor's request, the loan was structured so as to require a balloon payment or renewal every six months. As was the case with Whitfield, Teel ignored letters and phone calls from the bank when his loan matured six months later, so the bank contacted Minor. However, unlike Whitfield, Teel never made any payments at all on the loan with his own funds. On June 28, 1999, after having cashed a check a few days earlier, Minor paid approximately $1,200 cash to renew Teel's loan, just minutes before making cash payments on both of Whitfield's loans at the Peoples Bank branch in Biloxi. When Teel's loan became due again in February of 2000, Minor enlisted the help of his friend and fellow attorney Richard ("Dickie") Scruggs to act as intermediary in paying off the loan in full. In exchange for signing a 30-day promissory note, Scruggs gave Teel a check for $27,500 on February 23, 2000, which Teel used to pay off his loan. Minor then reimbursed Scruggs by check on March 9, 2000, thereby satisfying Teel's obligation to Scruggs.[9] Teel never contacted Scruggs regarding the promissory note again. Additionally, Teel failed to include the $27,500 check

_____

[8]Teel did report the $7,000 in cash contributions that Minor made to his campaign in early November of 1998.

[9]Sometime thereafter, Minor asked Scruggs to take his place as guarantor on one or both of Whitfield's loans, but Scruggs refused.

in his annual statement of economic interest for that year.

In the meantime, Minor & Associates was in the early stages of litigating Peoples Bank v. United States Fidelity and Guaranty (USF&G), which it had filed in the Eighth Chancery Court District the summer before Teel's election. Minor's firm represented Peoples Bank (the same bank that had made the loans to Whitfield and Teel) in a suit against its insurer, USF&G. Peoples Bank claimed that USF&G had a duty to defend it against a particular class of lawsuits being brought by its customers, but USF&G denied coverage under the bank's insurance policy. Despite the fact that this was a complex insurance dispute, Minor's firm had elected to try the case without a jury in chancery court, which is an equity court that generally handles matters such as divorce, child custody, juvenile delinquency, and property disputes.[10]

Immediately upon filing the complaint, Minor again saw to it that his own judge of choice was assigned to the case by filing a motion for an expedited hearing to schedule a trial before Judge J.N. Randall, who was appointed to the bench by the Governor largely at Minor's recommendation. Just as Whitfield had done in the Marks case, Randall issued a "Fiat" setting a hearing in his court and effectively assumed control of the case. However, Randall did not prove to be as cooperative as Minor would have liked. When USF&G moved to transfer the case to Circuit Court, Randall, who had never handled an insurance dispute before, granted the motion. Minor got "very upset," and, in an ex parte conversation, convinced Randall to take the case back.

In discovery, Minor sought access to all of USF&G's documents relating to Peoples Bank's claim, but USF&G objected on the basis of attorney-client privilege and work product. Already overloaded with work himself, Randall

---

[10]Judge Randall, who was originally assigned to the case, testified that he had never seen such a dispute filed in chancery court and that it was "very unusual."

9

assigned the discovery dispute to Teel, who, on October 16, 2000, rejected USF&G's privilege claims and ordered all documents disclosed to Peoples Bank. In response, USF&G filed a motion to reconsider with Randall, and Randall granted the motion and set aside Teel's ruling. Minor was "extremely upset" and immediately called upon Randall in his chambers for another ex parte meeting. Minor upbraided Randall and convinced him to reassign the entire case to Teel, and Randall obliged.[11]

After Teel took control of the case, USF&G's attorneys moved to stay the proceedings pending the outcome of USF&G v. Omnibank, which was then pending before the Mississippi Supreme Court. See 812 So.2d 196 (Miss. 2002). In Omnibank, another bank had sued USF&G based on the same contractual provisions at issue in Peoples Bank, and the Mississippi Supreme Court's decision would likely have resolved the dispositive issues in Peoples Bank as well. The federal district court in Omnibank had granted summary judgment in favor of the bank, finding that USF&G did have a duty to defend. See Ramsay v. Omnibank, 215 F.3d 502, 504 (5th Cir. 2000). On appeal, this court had certified the duty-to-defend question to the Mississippi Supreme Court. See id.

On July 30, 2001, Teel concluded that the motion to stay was "well taken" and agreed to stay the case, but only for a month, until September 1, 2001. Teel did not reschedule the trial, which was set for the following December. Therefore, when the Mississippi Supreme Court still had not reached a decision one month later, USF&G was faced with an imminent trial and the possibility of significant punitive damages. On December 18, 2001, Teel granted summary judgment for Peoples Bank on the duty-to-defend issue, reserving the issues of

---

[11]Finding the circumstances surrounding the filing of the case in chancery court and the reassignment of the case suspicious, USF&G's attorneys investigated for a connection between Minor & Associates and Teel but found none.

bad faith and punitive damages for trial. Fearful of a significant punitive damages award, USF&G agreed to enter into settlement talks. Teel served as the mediator, engaging in private discussions with each party in the attempt to reach an agreement. After these conferences proved unproductive, however, Teel took the unusual step of bringing the parties together to make an announcement. Teel declared that he was offended by USF&G's failure to defend Peoples Bank and that, in his determination,$1.5 million (five times the amount of actual damages in the case) was an appropriate settlement figure. On December 21, 2001, fearing a worse outcome if they tried the punitive damages issue before Teel, USF&G agreed to the $1.5 million settlement. Just over three months later, the Mississippi Supreme Court issued its opinion in Omnibank, determining that USF&G had no duty to defend under the insurance policy. See 812 So.2d at 201–02.

Meanwhile, unbeknownst to USF&G's attorneys, Minor had been providing other financial assistance to Teel (in addition to the loan transactions that had been completed the year before). In October of 2001 (after the one month stay had lapsed and the parties were preparing for trial in Peoples Bank), Teel, along with two other chancellors from the Eighth Chancery Court District, was under investigation by the Mississippi Administrative Office of the Courts—in Teel's case for allegedly keeping reimbursement money for himself rather than paying office-supply vendors. Minor held several strategy meetings with the judges and hired a public relations firm to help with media exposure. On or about October 31, 2001, Minor flew Teel and the other judges in his private plane to Jackson for a meeting in these matters that Minor had personally arranged with the Mississippi Attorney General. Finally, in June of 2002, after Teel was acquitted of the criminal charges, Minor sent Teel's attorney a check for $10,000 to cover part of the defense costs, for which he

11

received a thank-you note from Teel.

## PROCEDURAL HISTORY

On July 25, 2003, a federal grand jury sitting in the Southern District of Mississippi returned a sixteen-count indictment against defendants Minor, Whitfield, Teel, and two others, Mississippi Supreme Court Justice Oliver E. Diaz and his former wife, Jennifer Diaz. First and Second Superseding indictments were returned on February 20, 2004 and October 19, 2004, respectively, and Jennifer Diaz was eventually dismissed from the case in 2005. Following trial on the Second Superseding Indictment in the summer of 2005, the jury returned its verdict August 12, 2005. Justice Diaz was acquitted on all counts, Minor was acquitted on six counts, and Whitfield was acquitted on one count. The district court declared a mistrial on all other counts submitted to the jury, on none of which did the jury return a verdict.[12]

On December 6, 2005, a fourteen-count Third Superseding Indictment was

---

[12]No verdict was returned in 2005 on any of the counts involving Teel. One of the six counts on which Minor was acquitted in the 2005 trial (Count four) was a § 1341 charge based on Whitfield's September 20, 2002 transmittal of his August 26, 2002 $117,013.21 note to Radlauer (this transmittal was not alleged as a § 1341 count against Minor in the instant 2007 trial). Whitfield was also charged in that Count Five and the 2005 jury did not return any verdict as to Whitfield on that count. The other five counts in the Second Superseding Indictment of which Minor was acquitted each alleged offenses involving Minor and Diaz only. The sole count in the Second Superseding Indictment of which Whitfield was acquitted in the 2005 trial was Count Five, a § 1343 wire fraud count based on Radlauer's August 27, 2002 wire transfer of $118,652.42 to Peoples Bank in Biloxi (this transmittal was not alleged as a § 1343 count against Whitfield in the instant 2007 trial). Minor was also charged in that Count Five and the 2005 jury did not return any verdict as to Minor on that count.

The counts (other than those involving Diaz or Teel) on which the jury did not return a verdict in 2005 included: Count One, charging RICO against Minor, predicate acts including bribery in $40,000 and in $100,000 loans to Whitfield; Count Two charging mail fraud against Minor and Whitfield as to the service of summons in the Marks v. Diamond Offshore case; Count Three same as Count Two except related to a subpoena in the Marks case; Count Four (no verdict as to Whitfield); Count Five (no verdict as to Minor); Count Twenty-two (Whitfield accepting a bribe from Minor in the Marks case, contrary to § 666); Count Twelve (Minor bribe of Whitfield in the Marks case contrary to § 666).

returned against defendants Minor, Whitfield, and Teel. Count One charged Minor and Whitfield with conspiracy to commit various offenses against the United States under 18 U.S.C. § 371, including mail, wire, and honest services fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 2 and federal program bribery in violation of 18 U.S.C. § 666. Count Two charged Minor and Teel with conspiracy to violate the same statutes. Count Three charged Minor with racketeering in violation of RICO, 18 U.S.C. § 1962, the predicate acts being bribery and wire fraud. Counts Four through Seven charged Minor and Whitfield with devising a scheme to defraud the State of Mississippi of its intangible right to honest services through mail fraud, and Count 8 charged Minor with devising a scheme to defraud the State of Mississippi of its intangible right to honest services through wire fraud. Counts Nine and Ten charged Minor and Teel with devising a scheme to defraud the State of Mississippi of its intangible right to honest services through mail fraud. Count Eleven charged Whitfield with accepting bribes while acting as an agent of a state agency receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B), and Count Twelve charged Minor with offering those bribes in violation of 18 U.S.C. § 666(a)(2). Finally, under those same statutes, Count Thirteen charged Teel with accepting bribes while acting as an agent of a state agency receiving federal funds, and Count Fourteen charged Minor with offering those bribes. None of the defendants testified at trial.

On April 2, 2007, the jury found appellants guilty on all charges. In regard to Count Two, the jury found that the Government had proved that the Minor and Teel had conspired to commit federal program bribery under 18 U.S.C. § 666, but not mail, wire, and honest services fraud under 18 U.S.C. §§ 1341, 1343, 1346, and 2. In regard to the predicate acts underlying the Count Three RICO charges against Minor, the jury found that the Government had

13

proved bribery as to the $100,000 loan to Whitfield and wire fraud as to the wire transfer made by Radlauer, but that the Government had failed to prove bribery as to the $40,000 and $24,500 campaign loans that Minor made to Whitfield and Teel respectively. Finally, the jury concluded that, for the purposes of the counts related to federal program bribery under 18 U.S.C. § 666, Whitfield and Teel had served as agents of the Mississippi Administrative Office of the Courts (but not of the Harrison County, Mississippi Board of Supervisors general fund). Defendants were sentenced in September 2007.

The district court sentenced Minor as follows: sixty months as to Counts One, Two, Four, Five, Six, Eight, Nine, and Ten (conspiracy and mail, wire, and honest services fraud); one hundred and thirty-two months as to Count Three (racketeering); and one hundred and twenty months as to Counts Twelve and Fourteen (federal program bribery), with all sentences to run concurrently for a total sentence of one hundred and thirty-two months and three years' supervised release. The district court fined Minor $250,000 per count, for a total of $2.75 million. Finally, the district court ordered Minor, along with Teel, to pay $1.5 million in restitution to USF&G.

The district court sentenced Whitfield to sixty months as to Counts One, Four, Five, Six, and Seven (conspiracy and mail, wire, and honest services fraud) and one hundred and ten months as to Count Eleven (federal program bribery), with all sentences to run concurrently for a total sentence of one hundred and ten months and three years' supervised release. Finally, Whitfield was fined $125,000.

The district court sentenced Teel to sixty months as to Counts Two, Nine, and Ten (conspiracy and mail, wire, and honest services fraud) and seventy months as to Count Thirteen (federal program bribery), with all sentences to run concurrently for a total sentence of seventy months, and two years' supervised

14

release.  Finally, Teel, as stated above, was held jointly and severally liable with Minor on the $1.5 million restitution award to USF&G.

Appellants timely filed this appeal, asserting numerous errors on the part of the district court.  We address them each in turn below.

DISCUSSION

I.  Federal Program Bribery under 18 U.S.C. § 666

Appellants challenge their convictions for federal program bribery under 18 U.S.C. § 666.  That statute, entitled "Theft or bribery concerning programs receiving federal funds," provides in relevant part as follows:

> "(a) Whoever, if the circumstance described in subsection (b) of this section exists–
>
> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
> ****
> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or
>
> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
>
> shall be fined under this title, imprisoned not more than 10 years, or both.
>
> (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one

15

year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."

18 U.S.C. § 666(a)-(b) (emphasis added).

At trial, the Government claimed that, by virtue of their judicial offices, Whitfield and Teel were agents of the Mississippi Administrative Office of the Courts (AOC), which is a Mississippi state agency charged with "assist[ing] in the efficient administration of the nonjudicial business of the courts of the state." Miss. Code Ann. § 9-21-1 (1972).[13] In the years during which Whitfield and Teel served as judges, the AOC received well over $10,000 in federal funding in connection with four programs related to: (1) improving state youth courts; (2) studying juvenile defense; (3) collecting information on cases involving aliens; and (4) installing modern display systems in the courtrooms.

Before the case was submitted to the jury, appellants filed motions for a judgment of acquittal under FED. R. CRIM. P. 29 on all counts related to section 666.[14] (SROA Vol. 98 at 4059, Vol. 102 at 4637–38). In their motions, appellants asserted, inter alia, that (1): as judges, Whitfield and Teel were not agents of the AOC; and (2) their judicial rulings in Marks and Peoples Bank were neither "transactions" of the AOC nor otherwise connected to any "business" of the AOC. On appeal, appellants argued that there was insufficient evidence for a reasonable jury to find that Whitfield and Teel were agents of the AOC, but they failed to renew their claims that Whitfield and Teel's challenged judicial rulings in the referenced private party lawsuits were not related to the business or

---

[13]The Government also asserted that Whitfield and Teel were agents of Harrison County, but the jury ultimately rejected that contention.

[14]Appellants also filed motions to dismiss the indictment for failure to state an offense under FED. R. CRIM. P. 12. As the Rule 29 motions are dispositive, we do not consider the Rule 12 motions here.

transactions of the AOC. Troubled by the failure of the parties to address what we regarded as a fundamental issue in the case, we requested that the parties submit supplemental briefs discussing whether Whitfield and Teel's judicial rulings in Marks and Peoples Bank were made in connection with the transactions or business of the AOC, and the parties have done so.

A. Standard of Review

We review de novo the denial of Rule 29 motion for a judgment of acquittal. United States v. Valle, 538 F.3d 341, 344 (5th Cir. 2008). However, where a party fails to raise an issue on appeal, review, if any, is generally for plain error. See United States v. Evans, 848 F.2d 1352, 1359 (5th Cir. 1988).

B. Were Whitfield and Teel agents of the AOC?

Section 666 broadly defines "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). In United States v. Phillips, we held that for an individual to be an "agent" for the purposes of section 666, he must be "authorized to act on behalf of [the agency] with respect to its funds." 219 F.3d 404, 411 (5th Cir. 2000).

At trial, the Government presented testimony that the AOC handled the finances for the entire Mississippi court system, including payroll, travel expenses, inventory, and budgeting. Each judge was allotted $40,000 annually from the AOC to pay the salaries of chambers staff, including secretaries, paralegals, and law clerks. Although these staff personnel were technically employees of the AOC, in reality the judges maintained independent control over their chambers staff and were responsible for all employment decisions. Additionally, the judges were provided with another $4,000 each year to cover operating expenses and could request reimbursement for travel expenses.

17

Appellants contend that they should not be considered agents of the AOC under section 666, because the agency funds under their control were entirely unrelated to and separate from the federal funds received by the AOC.  This court has held that "[a]lthough the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, there must be some nexus between the criminal conduct and the agency receiving federal assistance."  United States v. Moeller, 987 F.2d 1134, 1137 (5th Cir. 1993).  In Phillips, we observed that "the funds in question need not be purely federal, nor must the conduct in question have a direct effect on federal funds.  The statute possibly can reach misuse of virtually all funds of an agency that administers the federal program in question."  219 F.3d at 411 (citing Salinas v. United States, 118 S.Ct. 469, 473–74 (1997)).  In Sabri v. United States, the Supreme Court explained why courts have interpreted section 666 broadly in this regard: "Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value.  Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there."  124 S.Ct. 1941, 1946 (2004).  Therefore, so long as there is a "nexus between the criminal conduct and the agency," see Moeller, 987 F.2d at 1137, the lack of a direct connection between the AOC funds under the judges' control and the federal funds in question does not preclude them from being considered agents of the AOC for the purposes of section 666.

In the sense that Whitfield and Teel hired chambers staff that were paid at the expense of the AOC, they were authorized as judges "to act on behalf of [the AOC] with respect to its funds."  See Phillips, 219 F.3d at 411.  Therefore, we will assume, arguendo, that Whitfield and Teel were agents of the AOC, but only in so far as they performed functions that involved AOC funds.  See Moeller, 987 F.2d at 1137 (focusing the section 666 agency inquiry on whether the

defendants were acting on behalf of the state agency receiving federal funds when they accepted the alleged bribes).

C.   Were the judicial rulings in Marks and Peoples Bank made "in connection with any business, transaction, or series of transactions" of the AOC?

In order for section 666 to apply, the bribe must be offered or accepted "in connection with any business, transaction, or series of transactions" of the agency receiving federal funds. 18 U.S.C. § 666(a)(1)(B), (2).   Thus, the key inquiry on this issue is whether Whitfield and Teel's decisions in Marks and Peoples Bank were connected with the transactions or business of the AOC.

Although this court has yet to address the reach of 666 in this particular respect, we note that at least one federal district court has dismissed an indictment brought under similar circumstances.  See United States v. Frega, 933 F. Supp. 1536, 1542–43 (S.D. Cal. 1996), aff'd in part, rev'd in part on other grounds, 179 F.3d 793 (9th Cir. 1999).   In Frega, an attorney and two state judges were charged with violating section 666 for a scheme in which the attorney allegedly bribed the judges in exchange for favorable rulings in cases pending in their courts.  Id. at 1538.  The district court dismissed the section 666 count of the indictment because it failed to "allege that federal funds were corruptly administered, were in danger of being corruptly administered, or even could have been corruptly administered."   Id. at 1543.   As the Frega court observed,

> "§ 666 was intended to protect the integrity of federal funds, and not as a general anti-corruption statute. . . .   Of course, state judges could be subject to § 666 in certain circumstances.  For example, if the state court system received federal funding for the purpose of appointing counsel in death penalty habeas proceedings, and a state court judge accepted a bribe in exchange for appointing a particular attorney as habeas counsel, § 666 would clearly be implicated, even if the actual funds used to pay counsel were state funds."

19

Id. at 1542–43.  The related cases of United States v. Massey, 89 F.3d 1433 (11th Cir. 1996), and United States v. Castro, 89 F.3d 1443 (11th Cir. 1996), illustrate the point made by the district court in Frega.  In those cases, the defendants were convicted under section 666 for their role in a bribery scheme in which state judges accepted kickbacks from attorneys in exchange for appointments as special assistant public defenders, an arrangement which garnered the attorneys (and ultimately the judges) significant fees at the expense of the county (which was a recipient of federal funds, in excess of 90 million a year).  Castro, 89 F.3d at 1447–48, 1454; Massey, 89 F.3d at 1436–37.

A review of the record in this case makes clear that, insofar as Whitfield and Teel may have been agents of the AOC, their role as such had nothing to do with their capacity as judicial decisionmakers.  As stated above, the purpose of the AOC is to "assist in the efficient administration of the nonjudicial business of the courts of the state."  Miss. Code Ann. § 9-21-1 (1972) (emphasis added).  As a fundamental matter, Whitfield and Teel's role in presiding over Marks and Peoples Bank involved the judicial business of the Mississippi courts.  If Minor had bribed Whitfield or Teel in exchange for their appointment of a friend or family member as a law clerk or secretary, then section 666 might have been implicated in this case.  As it stands, however, the bribes that Whitfield and Teel accepted in conjunction with their handling of Marks and Peoples Bank clearly had no "connection with any business, transaction, or series of transactions" of the AOC.  See 18 U.S.C. § 666(a)(1)(B), (2).

In its supplemental brief, the Government does not deny that appellants raised this point at trial in their Rule 29 motions for a judgment of acquittal.  However, the Government protests that appellants failed to raise this issue on appeal.  As a general rule, a party waives any argument that it fails to brief on

20

appeal. See FED. R. APP. P. 28(a)(9)(A); Proctor & Gamble Co. v. Amway Corp., 376 F.3d 496, 499 n.1 (5th Cir. 2004). However, this court has recognized an exception to this rule whereby we will consider a point of error not raised on appeal when it is necessary "to prevent a miscarriage of justice." United States v. Montemayor, 703 F.2d 109, 114 n.7 (5th Cir. 1983). Indeed, the Federal Rules of Criminal Procedure grant us the authority to reverse a conviction on the basis of plain error, even though the defendant has not raised the issue on appeal. FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). As the Supreme Court has observed: "'In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" Silber v. United States, 82 S.Ct. 1287, 1288 (1962) (quoting United States v. Atkinson, 56 S.Ct. 391, 392 (1936)). In Silber the Court reversed a conviction on an issue that it recognized was "not presented to the Court of Appeals and was not briefed or argued in this Court." Id. Similarly, in United States v. Musquiz, 445 F.2d 963, 966 (5th Cir. 1971), we reversed a conviction for insufficient evidence on a basis not urged below or on appeal, stating "We notice this error on our own motion, as we think we are required to do when the error is so obvious that failure to notice it would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" (quoting the above passage from Atkinson quoted in Silber). See also, e.g., United States v. Gonzales, 259 F.3d 355, 359 (5th Cir. 2001) ("We may raise an issue sua sponte 'even though it is not assigned or specified' when 'plain error is apparent,'"

quoting United States v. Pineda-Ortuno, 952 F.2d 98, 105 (5th Cir. 1992).[15]

We believe that this case presents just such an exceptional circumstance. Whitfield's and Teel's role as presiding judges in Marks and Peoples Bank had no "connection with any business, transaction, or series of transactions" of the AOC. See 18 U.S.C. § 666(a)(1)(B), (2). Therefore, by its own plain language, section 666 applies neither to Whitfield's and Teel's acceptance of bribes nor to Minor's offering of bribes in connection with those cases. The Government has cited no authority supporting a contrary conclusion. As such, we hold that the district court committed plain error when it denied appellants' Rule 29 motions for judgment of acquittal on the section 666 counts of the indictment.

II.  Jury Instructions

A.  Bribery

Appellants assert that the jury instructions were inadequate because the district court failed to require the Government to prove an explicit quid pro quo in connection with the bribery-related charges. We review a district court's jury instructions for abuse of discretion. United States v. Freeman, 434 F.3d 369, 377 (5th Cir. 2005). In doing so, "[w]e consider whether the instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" Id. (quoting United States v. Daniels, 281 F.3d 168, 183 (5th Cir. 2002)).

---

[15]We are aware that, generally speaking, the plain error rule is invoked when an appellant raises an issue on appeal that he failed to preserve in the court below. Here, we are confronted with the inverse situation, where appellants raised the issue below but not on appeal. Nevertheless, we conclude that the plain error rule has equal force in the present context, where enforcement of the waiver doctrine would result in a conviction that is unsupported by the plain language of the statute itself. See, e.g., United States v. Spruill, 292 F.3d 209, 213-15 (5th Cir. 2002).

We also note that as this matter was discussed at oral argument and the subject of full supplemental briefing, all parties have had an opportunity to be heard on this question despite its omission in the original appellate briefing.

As we have already disposed of the counts related to section 666, we consider the district court's bribery instruction only insofar as it relates to the alleged scheme to deprive the state of Mississippi of its intangible right to Whitfield's and Teel's honest services. In United States v. Brumley, we held that, in order to convict for the federal crime of depriving a state of the honest services of one of its officials, "a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of services owed to the official's employer under state law." 116 F.3d 728, 734 (5th Cir. 1997) (en banc). However, we were careful to note that, in order to constitute a federal crime, the state statute must concern "something close to bribery" and that "the mere violation of a gratuity statute . . . will not suffice." Id.

Consistent with that opinion and at the request of all parties, the district court based its definition of bribery in the jury charge on the Mississippi offense of bribery, which prohibits giving things of value to an official "with intent to influence his vote, opinion, action or judgment on any question, matter, cause or proceeding which may be then pending, or may be thereafter subject to vote, opinion, action or judgment" of the official. Miss. Code Ann. § 97-11-11 (1972). Specifically, the jury charge read as follows:

> "In order to prove the scheme to defraud another of honest services through bribery, the Government must prove beyond a reasonable doubt that the particular defendant entered into a corrupt agreement for Paul S. Minor to provide the particular judge with things of value specifically with the intent to influence the action or judgment of the judge on any question, matter, cause or proceeding which may be then or thereafter pending subject to the judge's action or judgment."

Additionally, when discussing the mens rea necessary to convict appellants, the district court instructed the jury as follows:

> "You've heard evidence about rulings that then Judge Whitfield and

23

then Judge Teel made on civil cases in which Mr. Minor's law firm represented civil plaintiffs. Such evidence bears on whether the defendant judges had any specific intent to violate the law. That is, a specific intent to take a bribe. In addressing this question, you may consider whether the rulings were accompanied by the judges' honest belief in the law and facts of a particular case rather than a corrupt purpose."

This jury charge was also consistent with the language of the Fifth Circuit Pattern Jury Instructions on "Bribery of a Public Official" under 18 U.S.C. § 201(b)(1) and "Receiving Bribe by Public Official" under 18 U.S.C. § 201(b)(2), which require the jury to find that the defendant gave "something of value . . . corruptly with intent to influence an official act" (bribery) or accepted "something of value . . . corruptly in return for being influenced in his performance of an official act" (receiving a bribe). See FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) §§ 2.12, 2.13 (2001).

Appellants do not contest the district court's incorporation of the Mississippi definition of bribery in the jury charge. Rather, they claim that, because the loan guarantees were made in the context of the Whitfield and Teel's electoral campaigns, their constitutional right to free political speech is at stake in this case. See Fed. Election Comm'n v. Wis. Right to Life, Inc., 127 S.Ct. 2652, 2676 (2007) (recognizing that "contributing money to, and spending money on behalf of, political candidates implicates core First Amendment protections"). As such, appellants assert that the Government was required to prove something more than mere bribery under Mississippi law—namely, that there was an explicit quid pro quo involving a specific official act identified at the time that Minor arranged and guaranteed the loans from Peoples Bank. See McCormick v. United States, 111 S.Ct. 1807, 1815–17 (1991). Appellants claim that, by failing to sufficiently require a quid pro quo exchange, the district court allowed the jury to convict them for acts that essentially amounted to gratuity, not

24

bribery.  See United States v. Sun-Diamond Growers of California, 119 S.Ct. 1402, 1406–07 (1999).  In their proposed jury instructions, appellants requested that the district court instruct the jury that: (1) the thing of value must be given "in order to influence or induce a specific official act"; (2) a financial transaction "is not a bribe unless at the time of the transaction Mr. Minor intended it to cause or accomplish some specific official action by the judge which, at the time of the transaction, was identified by Paul Minor"; and (3) "[a] corrupt intent exists only if there is a specific quid pro quo for the official to engage in a specific official act in exchange for the thing of value. . . .  Vague expectations of some future benefit are not sufficient to make a payment a bribe."

In McCormick, the Supreme Court held that a conviction under the Hobbs Act for extortion under color of official right requires a showing of an explicit quid pro quo when the alleged illegal payments take the form of campaign contributions.  111 S.Ct. at 1817.  The Court expressed concern that "[t]o hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions and expenditures."  Id. at 1816.  Thus, to prove a violation under the Hobbs Act, the Government is required to prove that "the payments are made in return for an explicit promise . . . to perform or not to perform an official act."  Id.  In Evans v. United States, the Supreme Court clarified that no overt act is required on the part of the official, because "the offense [of extortion under color of official right] is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts."  112 S.Ct. 1881, 1889 (1992) (emphasis added).  Therefore, to establish a quid pro quo, "the Government need only show that a public official has obtained a payment to which he was not

25

entitled, knowing that the payment was made in return for official acts." Id.

McCormick and Evans left open the question of what level of specificity is required to prove a quid pro quo in regard to the "quo" or agreed-upon official act. In United States v. Tomblin, a bribery case involving campaign contributions, we observed that "[t]he government need not prove the occurrence of the quid pro quo; proof of the agreement will suffice." 46 F.3d 1369, 1380 (5th Cir. 1995) (citing Evans, 112 S.Ct at 1889). In support of this proposition, we cited with approval to the Second Circuit's decision in United States v. Coyne, which held that the "'government does not have to prove an explicit promise to perform a particular act made at the time of payment. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise.'" Id. at 1381 n.19 (quoting United States v. Coyne, 4 F.3d 100, 114 (2d Cir. 1993), cert. denied, 114 S.Ct. 929 (1994)). Similarly, while noting that the "generalized hope or expectation of ultimate benefit on the part of the donor does not constitute a bribe," the Fourth Circuit has observed that "the government need not show that the defendant intended for his payments to be tied to specific official acts." United States v. Jennings, 160 F.3d 1006, 1013–14 (4th Cir. 1998) (internal quotations and citations omitted). The Jennings court went on to explain that

> "all that must be shown is that payments were made with the intent of securing a specific type of official action or favor in return. For example, payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf. This sort of 'I'll scratch your back if you scratch mine' arrangement constitutes bribery because the payor made payments with the intent to exchange them for specific official action."

Id. at 1014 (emphasis in original) (internal citations omitted). Thus, in the wake of McCormick and Evans, this circuit and others took the position that a particular, specified act need not be identified at the time of payment to satisfy the quid pro quo requirement, so long as the payor and payee agreed upon a specific type of action to be taken in the future.

Appellants argue that these cases were abrogated by the Supreme Court's subsequent decision in Sun-Diamond. See 119 S.Ct. at 1406–07, 1411. In that case, the defendant trade association was charged under the federal gratuity statute, 18 U.S.C. § 201(c)(1)(A), for giving various gifts to the Secretary of Agriculture in exchange for his influence in shaping federal regulations affecting the trade association's interests. Id. at 1405. "Although describing [the] two matters before the Secretary in which respondent had an interest, the indictment did not allege a specific connection between either of them—or between any other action of the Secretary—and the gratuities conferred." Id. The defendant argued that it could not be convicted under the gratuity statute without a showing that it had offered the allegedly illegal gratuities in exchange for specific official acts. See id. at 1406. To place this argument in context, the Supreme Court outlined the distinction between the related offenses of gratuity and bribery, both of which are contained in 18 U.S.C. § 201:

> "The distinguishing feature of each crime is its intent element. Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act, while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act. In other words, for bribery there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken."

27

Id. The Court took issue with the portion of the jury charge in Sun-Diamond suggesting that "§ 201(c)(1)(A), unlike the bribery statute, did not require any connection between respondent's intent and a specific official act." Id. The Court rejected the Government's position that the gratuity statute "reaches any effort to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be in a position to act favorably to the giver's interests." Id. at 1407 (emphasis in original) (internal quotations and citations omitted). Instead, the Court concluded that the language of the gratuity statute "seems pregnant with the requirement that some particular act be identified and proved." Id. Thus, the Court ultimately held that "in order to establish a violation of 18 U.S.C. § 201(c)(1)(A), the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." Id. at 1411.

Appellants ask this court to extend Sun-Diamond's reasoning to apply in the context of deprivation of honest services through bribery. In United States v. Kemp, the Third Circuit did just that. 500 F.3d 257, 281 (3rd Cir. 2007), cert. denied, 128 S.Ct. 1329 (2008) (finding that Sun-Diamond's discussion of the quid pro quo required for bribery under 18 U.S.C. § 201(b) "is equally applicable to bribery in the honest services fraud context"). Nevertheless, the Third Circuit determined that the jury charge in question met the standard laid out by the Supreme Court in Sun-Diamond. Id. The contested portion of the district court's jury instruction in Kemp stated that "where there is a stream of benefits given by a person to favor a public official, . . . it need not be shown that any specific benefit was given in exchange for a specific official act." Id. (internal citation and quotations omitted). In concluding that this was an accurate

28

statement of the law, the court observed that "[t]he key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action; the government need not prove that each gift was provided with the intent to prompt a specific official action." Id. at 282 (citing Jennings, 160 F.3d at 1014).

In United States v. Kincaid-Chauncey, the Ninth Circuit agreed with the Third Circuit that, in a prosecution for honest services fraud, "[w]hen the government's theory is that a public official accepted money in exchange for influence, . . . at least an implicit quid pro quo is required." 556 F.3d 923, 943 (9th Cir. 2009) (citing Kemp, 500 F.3d at 281–82). The court observed that bribery requires "a link between the item of value received and an understanding that the public official receiving it is to perform official acts on behalf of the payor when called upon." Id. at 943. The court cited to Sun-Diamond as an example of the Supreme Court's imposition of a nexus requirement "in a similar context." Id. However, the court went on to note that "the district court need not use the words 'quid pro quo' when it instructs the jury so long as the essential idea of give-and-take is conveyed. Nor need the implicit quid pro quo concern a specific official act." Id. (internal citations omitted).

In United States v. Ganim, a case involving federal program bribery, extortion, and honest services fraud through bribery, the Second Circuit took a different tack to arrive at the same result. See 510 F.3d 134, 144–50 (2nd Cir. 2007), cert. denied, 128 S.Ct. 1911 (2008). Like the Third Circuit in Kemp and the Ninth Circuit in Kincaid-Chauncey, the Ganim court rejected the contention that "the benefits received must be directly linked to a particular act at the time of agreement." Id. at 145, 148–49; see also United States v. Abbey, 560 F.3d 513,

519 (6th Cir. 2009) (holding that, in order to prove extortion, the Government "did not need to assert a direct link between [the official's] receipt of property and an explicit promise to perform a specific, identifiable act of improper influence when the gift was given.")  However, in contrast to the Third and Ninth Circuits, the Ganim court concluded that Sun-Diamond had no application outside of the illegal gratuity context.  510 F.3d at 145–47, 150.[16]

In reaching this conclusion, the court distinguished Sun-Diamond based on that case's heavy reliance on the particular language of the gratuity statute, which criminalizes payments "for or because of any official act."  Id. at 146.  In contrast, the court observed that the bribery-related statutes at issue in Ganim did not contain any similar language.  Id.  Additionally, the court determined that there was no "principled reason to extend Sun-Diamond's holding beyond the illegal gratuity context," because the Supreme Court's chief concern in Sun-Diamond was "supply[ing] a limiting principle that would distinguish an illegal gratuity from a legal one."  Id. at 146.  However, no such limiting principle was required outside the gratuity context, because, unlike the gratuity statute, the extortion and bribery statutes require "an intent to perform an act in exchange for a benefit—i.e., the quid pro quo agreement."  Id. at 146–47.  Therefore, by requiring that the Government prove the existence of a corrupt exchange, the bribery statutes obviated the need to demonstrate a direct link between the payments and a particular official act.  Id.  In summation, the court concluded as follows:

> "Thus, now, as before Sun-Diamond, so long as the jury finds that an official accepted gifts in exchange for a promise to perform

---

[16]We recognize the fact that the Ganim court went on to suggest in dicta that, if Sun-Diamond were to apply in the extortion and honest services contexts, then a particular official act would need to be identified at the time of payment.  See 510 F.3d at 146–47.

> official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act. To require otherwise could subvert the ends of justice in cases—such as the one before us—involving ongoing schemes. In our view, a scheme involving payments at regular intervals in exchange for specific officials acts as the opportunities to commit those acts arise does not dilute the requisite criminal intent or make the scheme any less 'extortionate.' Indeed, a reading of the statute that excluded such schemes would legalize some of the most pervasive and entrenched corruption, and cannot be what Congress intended."

Id. at 147. Although this statement was included in the court's discussion of extortion, the court indicated that the same reasoning applied in the context of honest services fraud through bribery. Id. at 146, 149–50.

We begin our analysis of the instant case by noting that, rather than a single payment or transaction, this case involves two ongoing bribery schemes similar to the ones addressed in Kemp, Kincaid-Chauncey, and Ganim. By ensuring that the loans became due every six months, Minor kept Whitfield and Teel at his mercy for as long as those debts remained outstanding. And because Minor made payments on behalf of Whitfield and Teel each time the loans became due, the illegal transactions continued well after Minor initially agreed to guarantee the loans. In Teel's case, even after the loan was paid off, Minor provided Teel with valuable financial and legal assistance in connection with his state prosecution for embezzling state funds. Thus, rather than single, lump-sum bribes, this case involved two prolonged bribery schemes spanning nearly four years each.

Whether we adopt the Third and Ninth Circuit's conclusion that Sun-Diamond applies in to honest services fraud but that a particular act need not be identified at the time of payment, or the Second Circuit's conclusion that Sun-Diamond does not apply to honest services fraud at all, we arrive at the same

31

result—namely, that the district court's jury instructions in this case accurately stated the law and did not constitute reversible error. For the sake of argument, we will assume that McCormick and Sun-Diamond do apply and that a quid pro quo instruction was required in this case. In doing so, we are also willing to assume that the initial $40,000 loan guarantee to Whitfield and the $25,000 loan guarantee to Teel were campaign contributions. However, we reject any attempt to characterize the $100,000 loan guarantee to Whitfield for the down-payment on a home and the financial and legal assistance provided to Teel in connection with his state prosecution for embezzlement as having anything to do with their respective electoral campaigns. Still, even if we assume that a quid pro quo instruction was necessary because at least some of the financial transactions in question were campaign-related, we conclude that the jury charge in this case sufficiently fulfilled that requirement. See United States v. Siegelman, 561 F.3d 1215, 1225 (11th Cir. 2009).

The jury instructions required the Government to prove that appellants entered into "a corrupt agreement for Paul S. Minor to provide the particular judge with things of value specifically with the intent to influence the action or judgment of the judge on any question, matter, cause or proceeding which may be then or thereafter pending subject to the judge's action or judgment." (emphasis added). Additionally, the jury was instructed to consider whether "the rulings were accompanied by the judges' honest belief in the law and facts of a particular case rather than a corrupt purpose." (emphasis added). Although the district court did not require the Government to prove that Minor and the judges had identified a particular case that would be influenced at the time that

32

Minor guaranteed the loans,[17] the overwhelming weight of authority from this court and our sister circuits supports the conclusion that the law does not require such a showing from the Government. See Tomblin, 46 F.3d at 1381, n.19 (Fifth Circuit); Abbey, 560 F.3d at 519 (Sixth Circuit); Kincaid-Chauncey, 556 F.3d at 943 (Ninth Circuit); Kemp, 500 F.3d at 282 (Third Circuit); Ganim, 510 F.3d at 145 (Second Circuit); Jennings, 160 F.3d at 1014 (Fourth Circuit). The law only requires that the Government prove the "specific intent to give or receive something of value in exchange for an official act" to be performed sometime in the future. See Sun-Diamond, 119 S.Ct. at 1406. This was satisfied by the portion of the jury charge requiring the Government to prove that appellants entered into a "corrupt agreement" and that the judges' rulings were based upon "a corrupt purpose" rather than an "honest belief in the law and facts." Despite the district court's failure to include the actual phrase quid pro quo in the jury charge, in the instant context the instructions sufficiently conveyed the "essential idea of give-and-take." See Kincaid-Chauncey, 556 F.3d at 943. Under the undisputed facts here, the jury's finding that there was a corrupt agreement necessarily entailed a finding of an exchange of things of value for favorable rulings in the judges' courts. Therefore, to the extent that a quid pro quo instruction may have been required in this case, the district court adequately delivered one.

B. Conspiracy instruction

Whitfield alleges that the district court erred by providing a conspiracy instruction that "allow[ed] the jury to consider all three . . . defendants together as conspirators, rather than differentiating between the alleged conspiracies

---

[17]Indeed, as Marks had not yet been filed in Whitfield's court and as Teel was not yet on the bench, it would have been impossible for appellants to identify those cases at the time the loan guarantees were made.

charged in the indictment." Accordingly, he claims, he was denied a fair trial through the constructive amendment of the indictment.

We disagree. In instructing the jury, the district court specifically distinguished between the conspiracy involving Minor and Whitfield charged in Count One and the conspiracy involving Minor and Teel charge in Count Two. The jury charge closely tracked the elements of conspiracy as set forth in Fifth Circuit Pattern Jury Instructions. See FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) § 2.20 (2001). It is well-settled that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law. United States v. Turner, 960 F.2d 461, 464 (5th Cir. 1992). In addition, the district court instructed the jury to consider each count and each defendant separately in accordance with the Fifth Circuit Pattern Jury Instructions on cases involving multiple defendants and multiple counts. See FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) § 1.23 (2001). The jury was also required to enter its verdict separately for each defendant and for each count of indictment. Accordingly, there was no error.

III. Sufficiency of the evidence regarding Whitfield's intent to use the mails

Whitfield claims that the Government produced insufficient evidence to establish that he knew or intended that the mails would be used to further a fraudulent scheme. The Government contends that Whitfield failed to adequately raise the issue below, therefore we should review only for a manifest miscarriage of justice. See United States v. McDowell, 498 F.3d 308, 312 (5th Cir. 2007). Although the basis of Whitfield's argument below is slightly unclear, we will assume that Whitfield adequately raised this issue with the district court in his Rule 29 motion for a judgment of acquittal. We review the district court's denial of that motion de novo. See Valle, 538 F.3d at 344.

34

Although Whitfield initially challenged his indictment for mail fraud in relation to Count Seven, which was premised upon his sending of the fraudulent promissory note to Radlauer on September 20, 2002, apparently he has abandoned this argument on appeal. Presently, Whitfield asserts that there was insufficient evidence to support a finding that he possessed the necessary mens rea to commit mail fraud in relation to the following counts of the indictment: Count Four, which was based upon the service of the summons and the complaint in the Marks case on Diamond Offshore on February 22, 1999; Count Five, which was based upon the subpoena duces tecum sent by Diamond Offshore to a witness in Marks on August 23, 1999; and Count Six, which was based upon the mailing of Minor & Associates' response to Diamond Offshore's motion for a new trial on August 3, 2000.

The mail fraud statute applies to anyone who "knowingly causes to be delivered by mail" anything "for the purpose of executing" "any scheme or artifice to defraud." See 18 U.S.C. § 1341. The Government is not required to prove that the defendant specifically intended for the mails to be used in furtherance of the alleged fraudulent scheme. United States v. Massey, 827 F.2d 995, 1002 (5th Cir. 1987). Rather, "'[t]he test to determine whether the defendant caused the mails to be used is whether the use was reasonably foreseeable." Id. (quoting R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350, 1354 (5th Cir. 1985)).

Pursuant to Rule 4(c)(3) of the Mississippi Rules of Civil Procedure, the circuit clerk court was authorized to issue a summons, along with a copy of the complaint, to Diamond Offshore by mail. Further, although Rule 45 of the Mississippi Rules of Civil Procedure requires that subpoena be served personally, the Government presented evidence that Diamond Offshore's attorney sent the subpoena duces tecum by mail with return receipt requested,

35

a practice that he testified was "very common" and considered effective so long as opposing counsel did not object. Finally, we find it difficult to believe that, as a trial judge, Whitfield would have been unaware that litigants commonly use the mail to serve responsive motions on one another.

On the whole, because we conclude that there was sufficient evidence for a jury to conclude that it was reasonably foreseeable to Whitfield that the above documents would be sent by mail, we find no reversible error in the district court's denial of Whitfield's Rule 29 motion on this point.

IV. Pretrial Issues

A. Joinder and severance

Appellants contend that they were improperly joined as defendants and that the court should have granted their motions to sever. A claim of misjoinder is a matter of law that we review de novo, but we may affirm if we find that misjoinder occurred but that the error was harmless. See United States v. Maggitt, 784 F.2d 590, 595 (5th Cir. 1986).

Two or more defendants may be charged in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." FED. R. CRIM. P. 8(b). We have held that "defendants charged with two separate—albeit similar—conspiracies having one common participant are not, without more, properly joined." United States v. Welch, 656 F.2d 1039, 1049 (5th Cir. Unit A 1981). Nevertheless, in Welch we went on to hold that "[w]hen otherwise separate offenses are charged as predicate acts of a substantive RICO count, they may be related to each other in such a way as to satisfy Rule 8(b)." Id. at 1051; see also United States v. Manzella, 782 F.2d 533, 540 (5th Cir. 1986) (finding joinder proper even though the defendant charged with mail fraud was not indicted along with his codefendant under RICO).

36

In this case, Whitfield and Teel were charged for their participation in two separate bribery schemes linked only by Minor's involvement in both. However, as was the case in Welch and Manzella, the bribery and wire fraud charges involving Whitfield and Teel constituted the predicate acts underlying the substantive RICO count brought against Minor. Therefore, we conclude that appellants were properly joined.

Appellants also argue that joinder was prejudicial and that the district court erred in denying their motions to sever. See FED. R. CRIM. P. 14. Rule 14 provides in relevant part as follows: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM. P. 14(a). The denial of a motion to sever is reviewed under an "exceedingly deferential" abuse of discretion standard. United States v. Tarango, 396 F.3d 666, 673 (5th Cir. 2005). We will not reverse a conviction based upon denial of a motion to sever "unless the defendant can demonstrate compelling prejudice against which the trial court was unable to afford protection, and that he was unable to obtain a fair trial." Massey, 827 F.2d at 1004.

We find no compelling prejudice that would warrant reversal in this case. Although the evidence in this case was "both massive and complex," "[i]t was not so complicated . . . as to prevent the jury from separating the evidence and properly applying it only to those against whom it was offered." Manzella, 782 F.2d at 540. Moreover, as noted above in our discussion of the conspiracy instruction, the district court "explicitly instructed the jury to consider each

37

offense separately and each defendant individually."[18]  See id.  Limiting instructions such as these are generally "sufficient to prevent the threat of prejudice resulting from unsevered trials."  See Massey, 827 F.2d at 1005; see also United States v. Mitchell, 484 F.3d 762, 775–76 (5th Cir. 2007), cert. denied, 128 S.Ct. 297 (2007) and 128 S.Ct. 869 (2008).  Therefore, the district court did not abuse its discretion in denying the motions to sever.

B.  The Speedy Trial Act

Whitfield argues that the district court violated his right to a speedy trial under the Speedy Trial Act, 18 U.S.C. §§ 3161(c)(1), et seq. (2000).[19]  Whether a district court has complied with the Speedy Trial Act is a matter of law subject to de novo review.  United States v. Jackson, 30 F.3d 572, 575 n.2 (5th Cir. 1994).[20]

The Speedy Trial Act requires that a defendant be tried "within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."  18 U.S.C. § 3161(c)(1).  Delays resulting from the filing and disposition of any pretrial

---

[18]The district court instructed the jury as follows: "[T]he case of each defendant should be considered separately and individually.  The fact that you may find one or more of the defendants guilty or not guilty as to any of the crimes charged should not control your verdict as to any other crime or as to any other defendant.  You must give separate consideration to the evidence as to each defendant."  This instruction tracked the precise language of the Fifth Circuit Pattern Jury Instructions for cases involving multiple defendants and multiple counts.  See FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) § 1.23 (2001).

[19]The Speedy Trial Act was amended effective October 13, 2008.  Therefore, we refer to the 2000 version of that statute, which was applicable at the time of the trial.

[20]To the extent that Minor purports to adopt Whitfield's argument on this point, he is precluded from doing so by his failure to move for dismissal under the Speedy Trial Act prior to trial.  See 18 U.S.C. § 3162(a)(2) (2000).

38

motions are excluded from calculation.  Id. § 3161(h)(1)(F).  In addition, the statute excludes

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.  No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

Id. § 3161(h)(8)(A).

As Whitfield does not claim that any non-excludable days occurred after he filed his motion to dismiss on June 1, 2006, we accordingly confine our consideration to the period between Whitfield's arraignment and the filing of his motion to dismiss.  The Government filed the Third Superseding Indictment on December 6, 2005, and Whitfield was arraigned on December 20, 2005.  However, in response to a pretrial motion filed by the Government, the district court also entered an ends-of-justice finding under section 3161(h)(1)(F) to allow for a thirty-day discovery period, which stopped Whitfield's speedy trial clock until January 19, 2006.  Minor was not arraigned until January 6, 2006, and the district court entered a similar order excluding another thirty days, which ended on February 6, 2006.  Section 3161(h)(7) excludes a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."  Therefore, Whitfield's speedy trial clock did not begin to run until February 6, 2006, when Minor's commenced.  See United States v. Bieganowski, 313 F.3d 264, 281 (5th

39

Cir. 2002); see also United States v. Bermea, 30 F.3d 1539, 1567 (5th Cir. 1994) ("[T]he excludable delay of one codefendant may be attributed to all defendants.")

On February 9, 2006, Minor filed a motion for continuance, arguing that two of his attorneys, who were new to the case and hired as lead counsel for the second trial, had scheduling conflicts and needed more time to prepare for trial in this "manifestly complex proceeding." On February 10, with the consent of Whitfield's counsel, the district court granted the motion, delaying the trial date from March 6, 2006, until August 14, 2006. The district court stated its reasons on the record as follows: (1) to avoid the attorneys' scheduling conflicts; and (2) to "give new counsel . . . June and July to prepare for the upcoming trial."

Whitfield claims that the district court's statement was insufficient to satisfy section 3161(h)(8)(A)'s requirement that the judge make an ends-of-justice finding on the record. We disagree. Our decisions do not require that the phrase "ends of justice" always be used, so long as the district court offers an acceptable reason for granting the continuance on the record. See United States v. Edelkind, 525 F.3d 388, 397 (5th Cir. 2008) (holding that the district court's finding on the record that the case was complex was sufficient to satisfy section 3161(h)(b)(A)); see also Bieganowski, 313 F.3d at 282 (same). Section 3161(h)(8)(B) lays out "[t]he factors, among others, which a judge shall consider in determining whether to grant a continuance under [section 3161(h)(8)(A)]," including:

> "(ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.
> &ast;&ast;&ast;&ast;
> (iv) Whether the failure to grant such a continuance in a case which,

40

> taken as a whole, is not so unusual or so complex as to fall within clause (ii), . . . would deny counsel for the defendant . . . the reasonable time necessary for effective preparation, taking into account the exercise of due diligence."

18 U.S.C. § 3161(h)(8)(B)(ii), (iv) (2000). We conclude that the district court's findings were sufficient under either one of the above provisions. Certainly, this case is facially and actually complex. However, even if the district court did not explicitly state as much when granting the continuance on February 10, 2006, the court's reasoning falls squarely within the factor listed in section 3161(h)(8)(B)(iv). Because "the [Speedy Trial] Act excludes from the calculation of the seventy-day limit any delay resulting from the proper grant of a continuance requested by a codefendant," Bieganowski, 313 F.3d at 281, the days between the district court's February 10 order granting a continuance until August 14, 2006, and Whitfield's motion for dismissal on June 1, 2006, were properly excluded under section 3161(h)(8)(A).[21]

Our holding is further buttressed by the fact that Whitfield consented to the continuance.[22] As we held in United States v. Westbrook, a defendant "may not seek 'to turn the benefit he accepted into an error that would undo his conviction. . . .'" 119 F.3d 1176, 1188 (5th Cir. 1997) (quoting United States v. Eakes, 783 F.2d 499, 503 (5th Cir. 1986)). "The Speedy Trial Act entitles criminal defendants to adequate time for preparing a defense, but that right may not be used as a two-edged sword in this fashion." Id. Thus, we follow the "sensible maxim that defendants ought not to be able to claim relief on the basis

---

[21]As our holding in regard to the February 10, 2006 continuance is dispositive on this issue, we decline to address Whitfield's arguments regarding the other continuances that were subsequently granted.

[22]Whitfield's attorney stated on the record as follows: "Your honor, we're not going to oppose their request to set the case in August, and we will be ready in August if that's when you set it."

of delays which they themselves deliberately caused." United States v. Kington, 875 F.2d 1091, 1108 (5th Cir. 1989). As Whitfield agreed to the continuance below, he is precluded from now challenging it on appeal.[23]

Therefore, because (1) the district court made a sufficient ends-of-justice finding on the record; and (2) Whitfield consented to the continuance, we find no violation of the Speedy Trial Act.

C. Errors in the indictment and grand jury testimony

On March 16, 2007, after the trial had commenced, Whitfield filed a "Motion to Dismiss the Indictment for Prosecutorial Misconduct and Presentation of False Testimony before the Grand Jury." The district court denied the motion, and Whitfield now claims error. Whitfield contends that his Fifth Amendment due process rights were violated when the Government presented a factually incorrect indictment and elicited "false" testimony before the grand jury.

As the Government freely admits, the indictment in this case contained a factual error concerning the effect of the fiat signed by Whitfield on February 10, 1999. The indictment charged that the fiat "authoriz[ed] the immediate payment of money for medical expenses" to Minor's client, Archie Marks. In actuality, the fiat merely granted an expedited hearing in Whitfield's court to set a trial date. Although no transcript of the grand jury proceedings appears in the trial record, Whitfield asserts, and the Government does not deny, that Special Agent Steve Callender of the FBI testified that the fiat "was presented to Judge Whitfield in order to get payment for medical expenses."[24]

---

[23]Moreover, had Whitfield not consented to the continuance the district court might well have stated its reasons for granting it in greater detail and formality.

[24]We note that this statement, while perhaps not entirely accurate, was not necessarily false, as Marks requested an expedited hearing on the alleged basis that he

FED. R. CRIM. P. 12(b)(3)(B) provides that a "motion alleging a defect in the indictment" must be made before trial. Failure to comply with this rule generally constitutes waiver. United States v. Cathey, 591 F.2d 268, 271 n.1 (5th Cir. 1979). However, a court may excuse a defendant's failure to timely file a motion for "good cause." Id.; FED. R. CRIM. P. 12(e). In this case, Whitfield was furnished with a copy of the indictment and a transcript of the grand jury proceedings well before trial, therefore he has no excuse for failing to move for dismissal prior to trial. See Cathey, 591 F.2d at 271 n.1 (finding good cause for untimely motion where defendant did not receive transcript of grand jury testimony until after trial had begun). As such, we find no error in the district court's refusal to grant Whitfield's untimely motion.

Further, "a district court may not dismiss an indictment for errors in grand jury proceedings unless such error prejudiced the defendant[]." Bank of Nova Scotia v. United States, 108 S.Ct. 2369, 2373 (1988). Whether or not prosecutorial misconduct prejudiced a defendant depends on whether it affected the grand jury's decision to indict. Id. at 2378. In this case, the grand jury was presented with substantial evidence in support of the Government's allegations against Whitfield. The minor factual error concerning the effect of the fiat was inconsequential. Under the Government's theory of the case, the true significance of the fiat was not that it (eventually) allowed Marks to collect money for medical expenses. Rather, by filing the motion before Whitfield specifically, Minor signified that the time had come for Whitfield to fulfill his part of the bargain. And by issuing the fiat and setting a hearing in his own court, Whitfield understood that he was bypassing court procedure and effectively assigning the case to himself. Thus, we believe that the error in the

needed to and could thereby obtain funds to pay his medical expenses as soon as possible.

43

indictment and Callender's testimony were not so significant as to "substantially influence" the grand jury's decision to indict Whitfield and thereby cause him prejudice.[25] See id.

As Whitfield's motion to dismiss was untimely and, in any event, he was not prejudiced by the error in the indictment or grand jury testimony in question, we find no reversible error.[26]

D. Juror Excusal

Appellants assert that the district court erred by excusing Juror 81 "based solely on her religious belief." Determinations as to the general qualifications of jurors are reviewed for abuse of discretion. United States v. McCord, 695 F.2d 823, 828 (5th Cir. 1983). The district court has discretion to excuse a juror for cause when the court "'is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.'" United States v. Flores, 63 F.3d 1342, 1355 (5th Cir. 1995) (quoting Wainwright v. Witt, 105 S.Ct. 844, 853 (1985)). Moreover, there is generally no basis for reversal unless appellants show that the jurors who served on the panel were not impartial. United States v. Jensen, 41 F.3d 946, 960 (5th Cir. 1994).

---

[25]In fact, as the Government points out, the error in the indictment and Callender's "false" testimony actually helped Whitfield at trial by allowing him to argue prosecutorial misconduct on the part of the Government. While cross-examining Diamond Offshore's counsel, Whitfield's attorney clearly demonstrated to the jury that the indictment was inconsistent with the fiat. In closing, Whitfield's attorney repeatedly offered the error in the indictment and Callender's statement to the grand jury as evidence that the prosecution was mishandled.

[26]Whitfield also urges that the district court erred in providing the indictment to the jury without redacting paragraph 14 of Count One, that is, the statement regarding the fiat in Peoples Bank. While this paragraph was indeed incorrect, there is no indication that any defendant requested that the section be excised. Since the offending provision is just one sentence in a thirty-one page indictment, and because the jury was made aware of the error through both testimony and closing argument, it was not prejudicial. Thus, we find no reversible error.

44

In questioning during voir dire, Juror 81 stated that her religious beliefs prevented her from passing judgment on others. As a result, the district court excused her from the jury panel, stating that "[t]his court is going to respect her religious belief and not force her to violate her religious belief." This was not an abuse of discretion, see United States v. Pappas, 639 F.2d 1, 4 (1st Cir. 1981), nor have appellants shown that the jury that they received was not impartial. We find no reversible error.

## V. Evidentiary rulings

Appellants allege numerous points of error in relation to the district court's evidentiary rulings at trial. Apparently in an attempt to demonstrate prejudice on the part of the district court, they devote significant energy to juxtaposing the district court's rulings in the first trial with its rulings in this the second trial. As the district court was not bound in any way by its evidentiary rulings in the first trial, we consider the district court's rulings in the second trial on their own merit.

We review evidentiary rulings for abuse of discretion. United States v. Ollison, 555 F.3d 152, 161 (5th Cir. 2009). "Even if the district court errs in its evidentiary ruling, the error can be excused if it was harmless." Id.; see also FED. R. EVID. 103(a) ("Error may not be predicated on a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . ."). "'A non-constitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 162 (quoting United States v. Hart, 295 F.3d 451, 454 (5th Cir. 2002)). Although each appellant focused on different evidentiary rulings in their briefs, many of those arguments were also adopted by their fellow appellants. For simplicity's sake, we have grouped the alleged points of error according to the briefs in which they were primarily argued.

A.  Minor's evidentiary claims

Minor contends that the district court prevented him from rebutting criminal intent by refusing to allow testimony or otherwise admit evidence regarding the following subjects: his preexisting personal relationship with Whitfield and Teel; the prominent role of attorney contributions in Mississippi state judicial elections; his expertise in Jones Act and insurance litigation; his practice of guaranteeing loans to friends; his filing of a potentially valuable case in a court other than Whitfield's during the time of the alleged bribery scheme; and the legal correctness of Whitfield's decision in Marks and Teel's decision in Peoples Bank.

### I. Minor's relationship with Whitfield and Teel

In regard to Minor's relationship with Whitfield and Teel, the only specific point of error alleged is the district court's refusal to allow Minor's office manager, Janet Miller, to testify as to whether Minor and Whitfield served together in any professional or community organizations.  However, the record is replete with witness testimony and arguments by Minor's counsel highlighting Minor's long-standing relationship with both Whitfield and Teel.  Therefore, even assuming the district court abused its discretion, it was harmless because the evidence on this point was cumulative.

### ii.  Attorney campaign contributions

Minor also asserts that the district court abused its discretion in refusing to admit an exhibit indicating that more than half of the contributions to the 1998 election campaigns for Mississippi chancery court and circuit court candidates originated with attorneys.  However, on cross-examination, Teel's attorney elicited testimony from the Executive Director on the Mississippi Commission on Judicial Performance supporting the conclusion that "most of the contributions to judicial candidates come from attorneys."  Therefore, to the

extent that this information was relevant to Minor's intent, appellants were not prejudiced by the exclusion of the exhibit.

### iii. Minor's legal expertise

Likewise, the district court did not abuse its discretion in excluding evidence that Minor was an expert in Jones Act and insurance litigation. To the extent that it was relevant, Minor's attorney made this point when he elicited testimony from Diamond Offshore's counsel in the Marks case indicating that Minor had a "very successful practice" and was a "very skilled and competent trial lawyer."

### iv. Minor's history of loan guarantees

Minor alleges the district court abused its discretion when it prevented John Walker, a Mississippi attorney and colleague of Minor's, from testifying that Minor had guaranteed a loan for him in the past. The district court concluded that the testimony was irrelevant. We have held that "evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." United States v. Dobbs, 506 F.2d 445, 447 (5th Cir. 1975). Moreover, even if we were to assume that the loan was relevant to Minor's intent, Andy Carpenter, the loan officer at Peoples Bank who handled the loan to Walker (in addition to the Whitfield and Teel loans), testified that Minor had guaranteed a number of loans for others, including employees and Walker's law firm.[27] Further, Miller testified that Minor often guaranteed loans to his employees, thus exhibiting a "pattern of guaranteeing bank loans out of friendship." (SROA Vol. 99 at 4175). Therefore, Walker's testimony in regard to the loan guarantee would have been cumulative and appellants were not harmed by its exclusion.

---

[27]Minor's attorney was also permitted to reiterate this point in his closing argument.

v. Other suit not filed in Whitfield's court

Minor also claims that the district court erred in refusing to allow his attorney to elicit testimony that Minor & Associates could have, but did not, file the most significant and potentially lucrative case it was working on at the time of the alleged conspiracy in Whitfield's court. The district court excluded this evidence as irrelevant. As stated above, evidence of noncriminal activity is generally irrelevant to rebut criminal intent. See Dobbs, 506 F.2d at 447. The district court did not abuse its discretion.

vi. Appellants' "expert" witnesses

Finally, Minor alleges that the district court committed error in excluding the testimony of two expert witnesses, attorneys James George and Alben Hopkins, who would have testified that Whitfield and Teel decided the Marks and Peoples Bank cases correctly. In a supplemental expert report filed by Minor, George indicated that he intended to testify on the "history of deliberations" of the Mississippi Supreme Court during its consideration of the Marks case on appeal. The district court initially refused to certify George under FED. R. EVID. 702 and the standard laid out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786, 2796–98 (1993), concluding that George's testimony would attempt to speculate on the mental impressions of the Mississippi Supreme Court, which were better expressed through that court's own published opinion in Marks. In offering proffer testimony, George disclosed his intent to also discuss the propriety of Whitfield's rulings in Marks. Acknowledging that the expert report did not allude to those matters, the defense nevertheless sought to elicit that testimony as rebuttal evidence. The district court refused, concluding that the correctness of Whitfield's ruling Marks was an issue in the first trial and thus was certainly expected to be a point of

48

contention in the second trial. Therefore, by failing to disclose these matters as required under FED. R. CRIM. P. 16(b)(1)(C), the district court found that Minor could not elicit that testimony at trial.

The district court did not abuse its discretion in excluding George's testimony. The court was justified in concluding that George's testimony would not assist the jury and was founded on unreliable methodology. See Daubert, 113 S.Ct. at 2796. As to George's opinion regarding the correctness of Whitfield's rulings in Marks, the district court did not abuse its discretion in preventing appellants from raising new matters that were not disclosed in George's expert report. See FED. R. CRIM. P. 16(b)(1)(C).

Hopkins intended to testify that Teel had ruled correctly in Peoples Bank. The district court refused to certify Hopkins because his testimony: (1) would not help the jury in resolving the ultimate issue in the case; (2) would violate FED. R. EVID. 704(b), which prohibits expert witnesses from testifying as to the criminal intent of the defendant; (3) would ask the jury to find contrary to a holding of the Mississippi Supreme Court; and (4) was based on "suspicious" methodology. Appellants' briefs provide no specific arguments as to why the district court erred in excluding Hopkins' testimony. Therefore, they have waived this issue on appeal. See Proctor & Gamble, 376 F.3d at 499 n.1.

B. Whitfield's evidentiary claims

Whitfield claims that the district court erred in: (1) excluding the billing records of Richard Salloum, counsel for Diamond Offshore in Marks; (2) denying appellants access to an FBI report made after interviewing Radlauer; (3) admitting the transcript from his divorce proceeding; and (4) allowing expert testimony from Government witnesses designated as fact witnesses; (5) admitting a summary witness and summary charts offered by the Government.

49

I. Salloum's billing records

Whitfield argues that the district court violated his rights under the Confrontation Clause of the Sixth Amendment when it excluded Salloum's billing records from his representation of Diamond Offshore in Marks.

A defendant is granted substantial leeway in cross-examining a witness to discover bias. E.g., United States v. Anderson, 933 F.2d 1261, 1276 (5th Cir. 1991). However, the Supreme Court has clearly stated:

> "It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"

Delaware v. Van Arsdall, 106 S.Ct. 1431, 1435 (1986) (quoting Delaware v. Fensterer, 106 S.Ct. 292, 295 (1985) (per curiam) (emphasis in original)). Appellants were permitted to cross-examine Salloum as to whether he was billing Diamond Offshore for the time he spent testifying at trial. Salloum was unsure as to whether he would be charging Diamond Offshore for his time, but he did admit to billing them for his legal services in the past. The district court concluded that evidence of the precise amount that Salloum's firm was paid in Marks was irrelevant.

We agree. The exact amount of fees that Salloum's firm charged its client for its services in the Marks case had little or no bearing on the proceedings below. The district court did not abuse its discretion in excluding that

50

information from cross-examination.

ii. Denial of access to FBI report

Whitfield claims that the district court erred in refusing to force the Government to produce and in failing to admit into evidence a "302" report created by the FBI  following an interview conducted with Leonard Radlauer during the FBI's investigation of the Whitfield loan.  Whitfield contends that Radlauer's testimony at the second trial contradicted his testimony before the grand jury and at the first trial, therefore he should been allowed to use the report for impeachment.  In fact, Whitfield never requested that the FBI report be admitted into evidence.  Therefore, he may not now claim error in respect to the report not being admitted.[28]  See Montemayor, 703 F.2d at 114 n.7.  Rather, during a recess in the cross-examination of Radlauer, Whitfield's attorney requested that the district court review the report in camera to determine whether it contained any statements that were inconsistent with Radlauer's testimony at trial.  When Whitfield sought to subpoena the FBI agent, the Government provided the district court with the report.   The district court reviewed the report, and, finding no discrepancies, declined to disclose its contents to the defense.

Where a district court has reviewed FBI reports in camera and determined that the material was not discoverable, we review only for clear error.  See United States v. Williams, 998 F.2d 258, 269 (5th Cir. 1993).  After reviewing the record, we find nothing to suggest that the district court's ruling was clearly erroneous.  See id.  Moreover, Whitfield was free to use Radlauer's sworn

---

[28]In any event, as the statements contained in that report were those of the FBI agent who made the report (who did not testify) and not Radlauer, they were inadmissible hearsay to the extent that Whitfield wished to offer them as truth of the matters asserted (e.g., what Radlauer stated) therein.  FED. R. EVID. 801.

testimony from the previous proceedings to impeach him during cross-examination at the second trial. See FED. R. EVID. 801(d)(1). Defense counsel was also permitted to, and did, cross-examine Radlauer concerning his statements to the FBI. We find no clear error.

### iii. Whitfield Divorce Transcript

Whitfield asserts that the district court abused its discretion by admitting the transcript from his 1999 divorce proceedings, in which he testified falsely that he was the only guarantor on the $40,000 campaign loan and that he had not contributed the purchase of the home he shared with his then-girlfriend. Whitfield claims this evidence was irrelevant and prejudicial. We disagree. It was relevant because it helped the government establish Whitfield's culpable mental state and the pattern of deception surrounding the loans he accepted from Minor. The district court did not abuse its discretion in admitting the transcript.

### iv. Government "expert" witnesses

Whitfield argues that the district court erred in allowing Richard Salloum, Wayne Drinkwater, and Leonard Radlauer to offer expert testimony in regard to the legal and ethical issues relevant to this case when they were not designated as experts by the Government. The record reveals that the witnesses provided fact testimony, not expert testimony under FED. R. EVID. 702. Moreover, Whitfield provides no citations to the "expert" testimony offered by these witnesses. Accordingly, this argument is waived. See De la O v. Hous. Auth. of City of El Paso, Tex., 417 F.3d 495, 501 (5th Cir. 2005).

### v. Summary charts and summary witness for the Government

Finally, Whitfield contends that the district court abused its discretion by admitting charts summarizing the financial transactions at issue in the case and by allowing Kim Mitchell, a summary witness for the Government, to explain

those charts to the jury.  FED. R. EVID. 1006 provides in part: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."

This Court has properly expressed some reluctance to generally endorse the use of summary evidence.  See United States v. Fullwood, 342 F.3d 409, 413–14 (5th Cir. 2003) ("The use of summary evidence serves an important purpose, but that purpose is not simply to allow the Government to repeat its entire case-in-chief shortly before jury deliberations.  Moreover, there are obvious potential dangers associated with its use.").  However, a district court does not abuse its discretion by admitting summary testimony where the evidence presented is voluminous and complex.  See Ollison, 555 F.3d at 162. Describing the admission of summary charts and use of summary witnesses, this court has explained:

> Rule 1006 allows admission of summaries when (1) the evidence previously admitted is voluminous, and (2) review by the jury would be inconvenient.  A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case.  Summary evidence must have an adequate foundation in evidence that is already admitted, and should be accompanied by a cautionary jury instruction.  Full cross-examination and admonitions to the jury minimize the risk of prejudice.

United States v. Bishop, 264 F.3d 535, 547 (5th Cir. 2001) (internal citations omitted).

In this case, the testimony of Mitchell and the admission of summary charts was neither cumulative nor prejudicial.  The information presented to the jury synthesized bank records and checks that were properly admitted, in order to explain the voluminous records supporting the transfer of money from Minor

to Whitfield and Teel.  Appellants were permitted to cross-examine Mitchell fully.  Whitfield does not contend that the charts were incorrect or misleading.  Such evidence does not implicate this Court's concerns in Fullwood, since the exhibits and testimony were not a summary of the Government's case; instead, they summarized complex records and documents for the benefit of the jury.  In addition, the district court properly instructed the jury as to the limited purposes of the summary charts, minimizing any risk of prejudice.[29]  There was no abuse of discretion.

C.  Teel's evidentiary claim — Drinkwater Report

Teel claims that the district court abused its discretion by excluding a pretrial report prepared by Wayne Drinkwater while representing USF&G in Peoples Bank.  The report contained Drinkwater's opinions regarding the strengths and weaknesses of USF&G's case in Peoples Bank, based upon the status of the law in Mississippi at the time, potentially damaging internal emails sent by USF&G employees, the quality of Marks' attorneys, and his view of then-Judge Teel.  At trial, Teel moved to admit the report as a business record under FED. R. EVID. 803(6).  The district court determined that the report was inadmissable, because it contained double hearsay in the form of Drinkwater's statements recounting the emails by USF&G employees and that the hearsay problem could not be cured through redaction.

A review of the record demonstrates that appellants' attorneys were permitted to fully cross-examine Drinkwater on the substance of his pretrial report, including his impressions regarding the damaging emails discussed

---

[29]Upon admitting the Government's summary charts, the district court instructed the jury as follows: "[C]harts and summaries are valid only to the extent that they accurately reflect the underlying supporting evidence . . . .  So these charts should be viewed in that manner, and you should give them only such weight as you think they deserve."

therein. Therefore, even assuming that the district court erred in refusing to admit the report itself, we find no harmful error substantially affecting appellants' rights.

D. Conclusion

The district court did not err in admitting any of the challenged evidence offered by the Government in this case. As to the evidence that was excluded, it was either irrelevant or cumulative. To the extent that the district court may have abused its discretion, we find no harmful error that affected any substantial rights of the appellants. See Ollison, 555 F.3d at 161; see also FED. R. EVID. 103(a).

VI. Sentencing

Appellants assert that the district court committed several sentencing errors. A district court's legal conclusions, including its interpretation of the United States Sentencing Guidelines (U.S.S.G. or Guidelines), are reviewed de novo. See United States v. Galvan-Revuelta, 958 F.2d 66, 68 (5th Cir. 1992). This court reviews a district court's factual determinations in applying the Guidelines for clear error. United States v. Solis-Garcia, 420 F.3d 511, 514 (5th Cir. 2005). "There is no clear error if the district court's finding is plausible in light of the record as a whole." United States v. Cisneros-Gutierrez, 517 F.3d 751, 764 (5th Cir. 2008) (quotation marks omitted).

As stated above, with this decision we reverse all counts related to 18 U.S.C. § 666, including Count Two (Minor and Teel conspiracy), Count Eleven (Whitfield federal program bribery), Count Twelve (Minor federal program bribery), Count Thirteen (Teel federal program bribery), and Count Fourteen (Minor federal program bribery). Therefore, as each of the appellants has had at least one conviction overturned, we find it appropriate to remand to the district court with instructions to resentence all appellants on all remaining

55

counts.  Had the judge known these counts would no longer be involved he might have analyzed the matter differently.  See United States v. Puig-Infante, 19 F.3d 929, 950 (5th Cir. 1994).  We note that, in case of Minor, because he received his longest sentence for his RICO conviction (one hundred and thirty-two months), remand might but will not necessarily result in a reduced sentence.  However, Whitfield was sentenced to one hundred and ten months under his federal program bribery conviction and only sixty months under his convictions for conspiracy and deprivation of honest services through mail fraud.  Similarly, Teel was sentenced to seventy months under his federal program bribery conviction and only sixty months under his convictions for conspiracy and mail fraud.  As a result, Whitfield and Teel's sentences likely will be reduced in some fashion.

Additionally, we address the following alleged points of error in order to provide some guidance to the district court on remand.

A.  Ex post facto sentencing concerns

Before we consider appellants' claims of error, we address the Government's contention that any error in sentencing was harmless because the district court incorrectly applied the more lenient United States Sentencing Guidelines from 2001 rather than the Guidelines as amended in 2006.  The district court concluded that, due to ex post facto concerns, he was required to sentence appellants according to the version of the Guidelines in effect at the time that appellants committed the offenses underlying the sentences being imposed.  See U.S. CONST. art. I, § 9, cl. 3; see also Collins v. Youngblood, 110 S.Ct. 2715, 2721 (1990).  Relying on non-binding authority, the Government contends that ex post facto clause has no application in the context of the post-

Booker[30] advisory Guidelines. See United States v. Demaree, 459 F.3d 791, 795 (7th Cir. 2006); United States v. Barton, 455 F.3d 649, 655 n.4 (6th Cir. 2006); but see United States v. Turner, 548 F.3d 1094, 1098–1100 (D.C. Cir. 2008); United States v. Carter, 490 F.3d 641, 643 (8th Cir. 2007).

We see no need to now address this point. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." Nelson v. United States, 129 S.Ct. 890, 892 (2009). The fact that district court used the 2001 Guidelines instead of the 2006 Guidelines does not necessarily mean that appellants were not prejudiced by any alleged errors in their sentencing. Thus, we now turn to appellants' arguments regarding their sentences, using 2001 Guidelines as applied by the district court to guide our analysis.

B. Fact-finding at sentencing

Appellants claim that the district court violated their Sixth Amendment right to trial by jury by basing their sentencing Guidelines ranges on facts not found by a jury beyond a reasonable doubt. This argument has no merit after the Supreme Court's decision in Booker rendering the Guidelines advisory. See United States v. Mares, 402 F.3d 511, 518 (5th Cir. 2005); see also Mitchell, 484 F.3d at 776. As we explained in Mares,

> "Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing. The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."

Id. (internal citations omitted). "Booker error occurs when the sentencing judge

---

[30]United States v. Booker, 125 S.Ct. 738 (2005).

bound by mandatory [Guidelines] increases the defendant's sentencing range based on facts not found by the jury or admitted by the defendant." United States v. Stephens, 487 F.3d 232, 245–46 (5th Cir. 2007). In this case, the district court, sentencing long after Booker, clearly understood that the Guidelines were advisory only; therefore, it did not err in finding facts relevant to sentencing.

C. Bribery Guideline

Appellants argue that, because the jury charge permitted them to be convicted of federal offenses based upon mere gratuity and not bribery, the district court erred in using the Guideline applicable to bribery-related offenses, U.S.S.G. § 2C1.1, rather than the Guideline applicable to gratuity offenses, U.S.S.G. § 2C1.2.[31] As stated above, we conclude that the district court adequately instructed the jury on bribery. Accordingly, because the jury found appellants guilty on a theory of bribery rather than gratuity, the district court did not err in relying on U.S.S.G. § 2C1.1.

D. Loss calculations in regard to the Marks case

Minor and Whitfield claim that the district court erred in including the full amount of the original award in Marks ($3.75 million) in their respective loss calculations. U.S.S.G. § 2C1.1(b)(2) provides for an enhanced sentence if the "value of the payment" or "the benefit received or to be received in return for the payment" exceeds $5,000. The level of enhancement is dictated by the table in U.S.S.G. § 2B1.1. Application Note 2 of U.S.S.G. § 2B1.1 provides that the loss

---

[31]U.S.S.G. § 2C1.1 applies to "a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence his official actions, or to a public official who solicits or accepts such a bribe." U.S. SENTENCING GUIDELINES MANUAL § 2C1.1 cmt. background (2001). In contrast, the background for gratuity under U.S.S.G. § 2C1.2 states that "A corrupt purpose is not an element of this offense." Id. § 2C1.2 cmt. background (2001).

should be determined by the greater of the actual loss or intended loss, which is defined in relevant part as "the pecuniary harm that was intended to result from the offense." The amount of the benefit to be received is a finding of fact that we review for clear error, and it need not be determined with precision. United States v. Griffin, 324 F.3d 330, 365–66 (5th Cir. 2003).

Before sentencing, the Mississippi Supreme Court reduced the damages award in Marks from $3.64 million to $1.64 million, 2003 Miss. LEXIS 88, at *36–37, and later vacated the district court's judgment altogether, 2007 Miss. LEXIS 237, at *1. As Diamond Offshore has suffered no actual loss, the presentence report (PSR) recommended that the district court use the intended loss, which the PSR concluded was the award in Marks as reduced by the Mississippi Supreme Court. The district court rejected this approach and instead determined that the intended loss was $3.75 million, which was the amount that Whitfield originally awarded to Marks before reducing the award to $3.64 million in response to Diamond Offshore's post-trial motions.

As we are remanding this case for resentencing, we need not decide whether the district court clearly erred in calculating the loss associated with the Marks case. However, upon remand, we suggest that the district court might more properly rely on the actual amount awarded by Whitfield in the Marks case ($3.64 million) adjusted by taking into account a reasonable estimate of whatever intrinsic value that case may have had if litigated before an impartial judge.

E.  Restitution award to USF&G

The district court awarded USF&G $1.5 million in restitution, holding Minor and Teel jointly and severally liable for the full amount. We conclude that this was not error. If Teel had stayed Peoples Bank as requested until the

Mississippi Supreme Court decided Omnibank, USF&G would have had no need to settle the case. Therefore, the $1.5 million restitution award was appropriate.

F. Fine applied to Minor

Minor was fined $250,000 per count for a total fine of $2.75 million. Minor contends that the district court abused its discretion by levying fines well above the range recommended in the Guidelines, which was $17,500 to $175,000. U.S.S.G. § 5H1.10 advises that the defendant's "socio-economic status" should not be taken into account when setting a fine. Nevertheless, the district court decided to vary from the Guidelines in order to ensure that the fine was sufficiently punitive to Minor in light of his substantial assets. 18 U.S.C. § 3572(a)(1) permits a sentencing court to consider "the defendant's income, earning capacity, and financial resources" when imposing a fine. Because we are remanding this case for resentencing, we need not decide whether the district court abused its discretion in setting Minor's fine. However, as we reverse three of the counts upon which the fine was based, we conclude that some level of a reduced fine on remand may be appropriate.

G. Obstruction of justice enhancement

Minor and Whitfield argue that the district court, after initially stating its intention not to apply an obstruction of justice enhancement under U.S.S.G. § 3C1.1, altered course and applied the obstruction enhancement at sentencing. To the extent that Minor and Whitfield claim that the district court committed procedural error in failing to give them sufficient notice of its intent to apply an obstruction enhancement, we presume that any such error will be corrected on remand.

H. Whitfield's acceptance of responsibility

Whitfield claims that he should receive a reduced sentence based upon his acceptance of responsibility. See U.S.S.G. § 3E1.1. "A district court's

determination as to whether a defendant has accepted responsibility is afforded great deference on review and is reviewed under a standard that is even more deferential than a pure clearly erroneous standard." United States v. Cordero, 465 F.3d 626, 630–31 (5th Cir. 2006) (internal quotations omitted). Whitfield contends that he accepted responsibility by cooperating with the FBI early in the stages of its investigation before he was indicted. However, Whitfield did not plead guilty and took his case to trial. Given the wide latitude afforded the district court on this issue, we clearly cannot say that the district court erred in refusing to find that Whitfield accepted responsibility for his crimes. However, we do note that today we reverse two of Whitfield's convictions. Thus, Whitfield was not entirely unjustified in challenging the charges brought against him in court.

I. Downward departure

Whitfield also argues that he should be granted a downward departure due to his health issues and family obligations. As he will be resentenced on remand, he may renew these arguments with the district court.

VII. Alleged Government misconduct and request for reassignment

We briefly note that appellants allege that they were wrongfully selected for prosecution by the Government due to their political affiliations. These unsubstantiated allegations are tied to no specific errors below, therefore we decline to address them here.

Further, after thoroughly reviewing the trial transcripts, we are convinced that Judge Wingate conducted the trial in a fair and impartial manner. Therefore, we deny appellants' request that the case be assigned to a different judge on remand.

VIII. Double Jeopardy

After oral argument herein, Minor and Whitfield moved for leave to file a

supplemental brief raising, for the first time, the issue of whether their prosecution under the Third Superseding Indictment was barred, in whole or in part by the Double Jeopardy Clause of the Fifth Amendment, more particularly the collateral estoppel component of that clause exemplified by Ashe v. Swenson, 90 S.Ct. 1180 (1970) and Yeager v. United States, 129 S.Ct. 2360 (2009). We granted leave to file such briefs.[32]

Whitfield's claim is based solely on the jury's 2005 acquittal of him on Count Five of the Second Superseding Indictment, a section 1343 charge based on the August 27, 2002 wire transfer by Radlauer of $118,652.42 from New Orleans to the Peoples Bank in Biloxi, Mississippi, to pay off Whitfield's loan there. Whitfield was not charged with any such offense under the Third Superseding Indictment, and hence the only possible double jeopardy claim on Whitfield's part in that respect is under Ashe's collateral estoppel doctrine. In this connection Whitfield claims that his acquittal means that the jury found it was not proved that he entered into the charged section 1341, section 1343 or section 1346 scheme with Minor related to depriving the State of Mississippi of his honest services in the Marks v. Diamond Offshore case.

Minor's claim is based solely on the jury's 2005 acquittal of him on Count Four of the Second Superseding Indictment, a section 1341 charge based on Whitfield's September 20, 2002 transmittal of his August 26, 2002 $117,013.12 note to Radlauer in New Orleans. Minor was not charged with any such offense under the third Superseding Indictment, and hence the only possible double jeopardy claim on Minor's part in that respect is under Ashe's collateral estoppel

---

[32]Our order doing so provides: "Each appellant's brief authorized hereunder shall also address whether any such double or collateral estoppel contention has been waived or forfeited by the appellant in question and whether this court may or should address any such contention. This order makes no determination of any such matter." (emphasis added).

doctrine. Minor's claim is that said acquittal means that the jury found it was not proved that he entered into the charged section 1341, section 1343 or section 1346 scheme with Whitfield related to depriving the State of Mississippi of Whitfield's honest services in the Marks case.

We first conclude that these double jeopardy claims are clearly either waived or forfeited.

To begin with, these claims were not raised in the trial court.[33]  The Supreme Court has made it clear that failure to raise a double jeopardy defense in the trial court constitutes a waiver thereof.  See Peretz v. United States, 111 S.Ct. 2661, 2669 (1991) ("The most basic rights of criminal defendants are . . . subject to waiver.  See, e.g., . . . United States v. Bascaro, 742 F.2d 1335, 1365 (CA 11 1984) (absence of objection is waiver of double jeopardy defense), cert.

---

[33]Minor asserts that double jeopardy was raised by his "Motion Of Defendant Minor To Dismiss Due To Selective Prosecution And Related Due Process Issues" filed (by his new counsel) in the district court June 6, 2006.  This one sentence motion states that it "hereby renews, incorporates herein by reference, and asserts as to the pending Third Superseding Indictment against him, the previous Motion to Reconsider filed in this proceeding on September 13, 2005" and "renews his previous motion for an evidentiary hearing with respect to the selective prosecution and related due Process issues raised in each such previous dismissal motion."  The only defense motion filed on or after the August 12, 2005 verdict to which Minor's June 6, 2006 motion can reasonably be understood as referring is Minor's September 13, 2005 "Motion To Reconsider His Motions To Dismiss For Selective Prosecution, Vindictiveness, And Other Due Process Violations And Renewed Request For An Evidentiary Hearing."  That motion makes absolutely no mention of double jeopardy or collateral estoppel and cites no cases related thereto.  We also note that Ashe v. Swenson collateral estoppel arises under the double jeopardy clause, not the due process clause.  See, e.g., Showery v. Samaniego, 814 F.2d 200, 203 (5th Cir. 1987); Parr v. Quarterman, 472 F.3d 245, 254 (5th Cir. 2006).  Further, the district court, after the December 6, 2005 Third Superseding Indictment was returned, at various pretrial hearings inquired of the parties what motions were pending, and at no time was any motion mentioned asserting double jeopardy or collateral estoppel.  Nor did the district court after the return of the third Superseding Indictment ever purport to rule on any matter concerning double jeopardy or collateral estoppel.

denied sub nom. Hobson v. United States . . . 105 S.Ct. 3476 . . . (1985); . . . ."[34]

We have likewise so held. See, e.g., United States v. Myers, 104 F.3d 76, 79 n.2 (5th Cir. 1997); United States v. Moore, 958 F.2d 646, 650 (5th Cir. 1992); Grogan v. United States, 394 F.2d 287, 289 (5th Cir. 1967). See also United States v. Scott, 464 F.2d 832, 833 (D.C. Cir. 1972); FED. R. CRIM. P. 12(b)(3), 12(e).

The appellants' failure to raise this issue in their original briefs in this court (or even in their reply briefs) likewise clearly constitutes a waiver or forfeiture of their contentions in this respect. See, e.g., Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993); United States v. Ogle, 415 F.3d 382 (5th Cir. 2005).[35]

---

[34]In Bascaro, the Eleventh Circuit held:
"We do not, however, reach the merits of Bascaro's double jeopardy claim. The issue is raised for the first time on appeal; Bascaro's double jeopardy defense was thus waived by his failure to assert it at trial. Grogan v. United States, 394 F.2d 287, 289 (5th Cir. 1967)." Id. at 1365.

[35]We reject the argument of Minor and Whitfield that because this court would have rejected their claims based on consideration of the counts on which the jury hung in the 2005 trial (see note 12, supra), that this excuses their failure to make any mention of their double jeopardy-collateral estoppel claims in either their opening or reply briefs in this court. Appellants rely in this connection on our decision in United States v. Yeager, 521 F.3d 367 (5th Cir., March 17, 2008), reversed. Yeager v. United States, 129 S.Ct. 2360 (June 19, 2009) (certiorari was filed in Yeager July 14, 2008 and was granted November 14, 2008, 129 S.Ct. 593). As the Supreme Court's opinion in Yeager reflects, there had been since at least the 1990s a split in the circuits respecting consideration in this context of counts on which the jury had hung. Id. at 2365. To paraphrase Bousley v. United States, 118 S.Ct. 1604, 1611 (1998), cause excusing failure raise a claim on direct review may not consist simply of the fact that the claim would have been 'unacceptable to that particular count at that particular time.' (quoting Engle v. Isaac, 102 S.Ct. 1558, 1573 n.35 (1982)). We frequently have briefs arguing that certain of our controlling precedents have been incorrectly decided. See, e.g., United States v. Mitchell, 484 F.3d 762, 776 (5th Cir. 2007). This also necessarily follows from the fact that where a claim on appeal is predicated on a change in the law following trial and before the decision on direct appeal, the change does not result in reviewing the claim under Rule 52(a) but rather the claim is reviewed under Rule 52(b) (at least if timely raised in the court of appeals) with the required plainness of the error judged under the state of the law at the time the court of appeals acts. See, e.g., Johnson v. United States, 117 S.Ct. 1544, 1548-49 (1997).

We assume, arguendo only, that the claims of Minor and Whitfield in this respect are merely forfeited, rather than waived, so that they may be reviewed for plain error under FED. R. CRIM. P. 52(b). See, e.g., United States v. Lewis, 492 F.3d 1219 (11 Cir. en banc, 2007) (reviewing under Rule 52(b) claim of double jeopardy timely raised on appeal but not raised in the district court, finding no error). In Yeager the Court stated (129 S.Ct. at 2366-67):

> ". . . Ashe [v. Swenson] . . . held that the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial. . . . Because the only contested issue at the first trial was whether Ashe was one of the robbers, we held that the jury's verdict of acquittal collaterally estopped the state from trying him for robbing a different player during the same criminal episode . . . . To decipher what a jury has necessarily decided, we held [in Ashe] that courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' Id. at 444, 90 S.Ct. 1189 (internal quotation marks omitted). We explained that the inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'"

Yeager goes on to hold that the jury's failure to reach a verdict on any count or counts may not be considered in determining what the jury necessarily decided by its acquittal on any other count. Id. at 2367.

It is likewise clear the defendant invoking Ashe has "the burden . . . to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." Dowling v. United States, 110 S.Ct. 668, 673 (1990).

Applying the foregoing principles from the Supreme Court's opinions in Yeager and Dowling, and reviewing the record of the prior trial, including the

evidence (which included no testimony from either Minor or Whitfield), jury charge, and argument of counsel, we conclude that it is certainly not clear or obvious – as it must be even if the claim is not waived but merely forfeited – that the jury at the first trial either by its acquittal of Whitfield on Count Five (section 1343 wire fraud based on Radlauer's August 27, 2002 wire transfer of funds to to pay off Whitfield's loan) necessarily found that Whitfield engaged in no honest services deprivation scheme with Minor respecting the Marks case, or that by its acquittal of Minor on Count Four (section 1341 mail fraud based on Whitfield's September 27, 2002 transmittal by public carrier of his note to Radlauer) necessarily found that Minor engaged in no honest services deprivation scheme with Whitfield respecting the Marks case.

The jury in the first trial was expressly instructed in both Counts Four and Five that the mailing, carrier transmittal or wiring charged had to be reasonably foreseeable to each particular defendant. That was not an uncontested issue in either count. As to Whitfield's acquittal on Count Five, relating to the Radlauer August 27, 2002 wire transfer, Whitfield's counsel in his closing jury argument specifically urged that this was not reasonably foreseeable to Whitfield.[36] Moreover, neither Whitfield nor Minor has pointed us to any specified direct evidence that Whitfield had any prior knowledge that such a wire transfer was contemplated, or of facts that would have beyond reasonable

---

[36]Counsel stated:
"With respect to the wire transfer * * * what evidence is there to indicate that John Whitfield knew anything about any wire transfer? This is Count 5. The wire transfer. I mean what evidence did you hear that ever indicated that the wire system was used in anything – any dealings that John Whitfield had with Paul Minor? Everything was either paid at the bank, in person. There is no evidence to indicate that wire was foreseeable or any payment of any note to anybody anywhere."
Counsel also argued "[i]f you've got a scheme to defraud . . . it has got to be reasonably foreseeable that something would be mailed."

dispute established that on or before August 27, 2002 such a wire transfer was reasonably foreseeable to him. Similarly as to Minor's acquittal on Count Four, relating to the September 20, 2002 carrier transfer to Radlauer of Whitfield's promissory note, Minor's counsel was at great pains to show by cross-examination of Minor's office manager, that the Whitfield note which she typed at Minor's direction and subsequently left in Minor's mailbox, was not the same document (or a xerox or similar copy) as the Whitfield note that Radlauer received by carrier from Whitfield's law firm (and although the notes were in almost identical wording, they were in different type fonts, and that prepared by Mintor's office manager was for $119,000, while that received by Radlauer was for $117,013.12). There is no evidence of how the note form typed by Minor's office manager got from Minor's mailbox to Whitfield or his law firm. There is no evidence of any oral or written communications between Whitfield and Minor on this particular note or its transmittal. The jury may have reasonably concluded that it was not established beyond a reasonable doubt that Whitfield would reasonably foresee that some note other than what his office manager had prepared would be mailed or transmitted by carrier to Radlauer.

Certainly no plain error (and indeed we believe no error at all) is shown respecting these belated double jeopardy-collateral estoppel claims. Those claims are accordingly rejected.

## CONCLUSION

As to Paul Minor, we REVERSE his conviction for conspiracy to commit federal program bribery under Count Two and his convictions for federal program bribery under Counts Twelve and Fourteen. We AFFIRM his convictions on all other counts. Because of our reversal as to Counts Two, Twelve, and Fourteen, his sentences on all counts are VACATED and the cause as to him is remanded for resentencing on all the remaining counts of conviction.

67

As to John Whitfield, we REVERSE his conviction for federal program bribery under Count Eleven. We AFFIRM his convictions on all other counts. Because of our reversal as to Count Eleven, his sentences on all counts are VACATED and the cause as to him is remanded for resentencing on all the remaining counts of conviction.

As to Walter Teel, we REVERSE his conviction for conspiracy to commit federal program bribery under Count Two and his conviction for federal program bribery under Count Thirteen. We AFFIRM his convictions on all other counts. Because of our reversal as to Counts Two and Thirteen, his sentences on all counts are VACATED and the cause as to him is remanded for resentencing on all the remaining counts of conviction.[37]

---

[37]All outstanding motions not previously (or herein above) ruled on are hereby denied as moot.